## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAPITOL HILL BAPTIST CHURCH,**<br>525 A Street NE<br>Washington, DC 20002<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**MURIEL BOWSER, in her official<br>capacity as Mayor of the District of<br>Columbia,**<br>John A. Wilson Building<br>1350 Pennsylvania Avenue, NW<br>Washington, DC 20004<br><br>**DISTRICT OF<br>COLUMBIA,**<br>c/o Karl A. Racine, Attorney General<br>400 6th Street, NW<br>Washington, DC 20001<br><br>    **Defendants.** | **Civil Action No.**   1:20-cv-2710 |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Capitol Hill Baptist Church ("CHBC" or the "Church") brings this action to stop Mayor Muriel Bowser and the District of Columbia (collectively, "Defendants") from violating its rights under the First and Fifth Amendments to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq.*, and alleges as follows:

### I. Preliminary Statement

1.    Since February 27, 1878, when the first 31 members of CHBC covenanted together at the corner of 6th and A Streets, NE in the District of Columbia, the Church's members have gathered every Sunday for corporate worship a few blocks from this courthouse.

- 1 -

2.      For CHBC, a weekly in-person worship gathering of the entire congregation is a religious conviction for which there is no substitute.  The Church does not offer virtual worship services, it does not utilize a multi-site model, and it does not offer multiple Sunday morning worship services.

3.      In March of this year, District of Columbia Mayor Muriel Bowser issued an executive order that, among other things, prohibited CHBC from gathering as one for in-person worship, whether indoors or outdoors.

4.      Now, six months later, that ban on CHBC's corporate worship gatherings remains in effect in the District of Columbia.  The Mayor's orders prohibit gatherings of over 100 people for purposes of worship, even if held outdoors and even if worshippers wear masks and practice appropriate social distancing.  Under the District's four-stage plan, CHBC's in-person worship gatherings will be prohibited until scientists develop either a widely-available vaccine or an effective therapy for COVID-19.

5.      In hopes of resuming its corporate worship gatherings in the District of Columbia, CHBC filed an application with the Mayor's Office on June 10, 2020, seeking a waiver from Mayor Bowser's prohibition on large gatherings.  Despite the Church's repeated outreach to the Mayor's Office, both directly and through its city councilman, and a resubmittal of the waiver request on September 1, 2020, the District refused to rule on the Church's application for months before rejecting the application last week, leaving CHBC subject to the Mayor's executive order, the violation of which is punishable by civil and administrative penalties.

6.      Meanwhile, Defendants have been discriminatory in their application of the ban on large scale gatherings.  For example, on June 6, 2020, Mayor Bowser appeared personally at an outdoor gathering of tens of thousands of people at the corner of 16th and H Streets, NW and

delivered a speech describing the large gathering as "wonderful to see."  Similarly, on four occasions between June and August 2020, the District's Metropolitan Police Department closed city streets to accommodate protests and marches of thousands to tens of thousands of people. And only three weeks ago, the Mayor coordinated with organizers of the Commitment March on Washington to "re-imagine" the five-hour event on the steps of the Lincoln Memorial for several thousand people in attendance to hear an array of speakers.

7.      The Church takes no issue with Defendants' decision to permit these gatherings, which are themselves protected by the First Amendment, and the Church supports this exercise of First Amendment rights.  The Church does, however, take exception to Defendants' decision to favor certain expressive gatherings over others.  The First Amendment protects both mass protests and religious worship.  But Mayor Bowser, by her own admission, has preferred the former over the latter.  When asked why she celebrates mass protests while houses of worship remain closed, she responded that "First Amendment protests and large gatherings are not the same" because "in the United States of America, people can protest."  In the United States of America, people can gather for worship under the First Amendment as well.

8.      Faced with the District's discriminatory treatment and with no end in sight to the legal ban on worship gatherings, CHBC's membership reluctantly voted to initiate this lawsuit to reclaim their most fundamental of rights: the right to gather for corporate worship free from threat of governmental sanction.

9.      The District's now six-month ban on CHBC's religious gatherings, even if held outdoors with appropriate precautions, violates RFRA and the First and Fifth Amendments to the United States Constitution.

## II. Parties

10.     Capitol Hill Baptist Church, founded in 1878, is a Christian church in Washington, DC.  It is incorporated in the District of Columbia and has a principal office located at 525 A Street NE, Washington, DC 20002.

11.     Defendant Muriel Bowser is and was at all times relevant hereto the duly-elected Mayor of the District of Columbia and as such was responsible for the promulgation and implementation of the policies, procedures, and practices of the District of Columbia.  She is named as a defendant in this action in her official capacity as Mayor.

12.     Defendant District of Columbia is and was at all times relevant hereto a municipal corporation and was and is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees.

## III. Jurisdiction and Venue

13.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because CHBC alleges an ongoing and imminent violation of its rights under the Constitution of the United States and RFRA.

14.     The Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b).  All Defendants are residents of and/or perform their official duties in this district.  In addition, a substantial part of the events giving rise to the claims in this Complaint arose in this district because the prohibition of CHBC's services will be enforced in this district, because some or all

of its members reside in this district, and because some or all of the actions of the Defendants that are the subject of this Complaint occurred in this district.

## IV. Facts

### A. Plaintiff Capitol Hill Baptist Church

16.     CHBC is "an evangelical community of believers."  Capitol Hill Baptist Church, *About Us*, https://www.capitolhillbaptist.org/about-us/ (last accessed September 21, 2020).

17.     CHBC believes that if the Bible is the cornerstone of its church, "membership is the cement" that holds the church together.  Capitol Hill Baptist Church, *Membership*, https://www.capitolhillbaptist.org/connect/membership/ (last accessed September 21, 2020).  As of the date of the filing of this Complaint, CHBC has 853 members, 61% of whom live in the District of Columbia.

18.     On a typical Sunday prior to the outbreak of COVID-19, CHBC had approximately 1,000 people attend its Sunday morning worship service.

19.     Dr. Mark Dever has served as the senior pastor of CHBC since 1994.  Capitol Hill Baptist Church, *Leadership & Staff: Mark Dever*, https://www.capitolhillbaptist.org/about-us/leadership-staff/member/1267131/ (last accessed September 21, 2020).  Dr. Dever holds a number of advanced degrees, including a doctorate in ecclesiastical history from Cambridge University.  Dr. Dever has written and spoken extensively on the theological significance of a church's weekly in-person worship gathering of the entire congregation.

### B. The Significance of Gathering

20.     For nearly 2,000 years, Christians have gathered each Sunday throughout the year in observance of Christ's resurrection from the dead on the first day of the week, and the physical gathering of the church is central to that celebration.  Indeed, the Greek word translated

as "church" in our English versions of the Christian scriptures is "ekklesia," which literally means "assembly."  A.T. Robertson, A GRAMMAR OF THE GREEK NEW TESTAMENT IN THE LIGHT OF HISTORICAL RESEARCH (3d ed. 1919).

21.     As with other communities of Christian faith around the country, CHBC believes that a central part of following Christ is worshipping together in the same physical space.  This belief derives, in part, from the exhortation found in the Christian scriptures that believers "not forsak[e] the assembling of ourselves together."  Hebrews 10:25 (KJV).

22.     CHBC has a church covenant, which is a statement of how the church agrees to live as a church.  *See* Capitol Hill Baptist Church, *Church Covenant*, https://www.capitolhillbaptist.org/about-us/what-we-believe/church-covenant/ (last accessed September 21, 2020).  The church covenant is reaffirmed at all members' meetings and before taking communion.  In the church covenant, CHBC members agree, consistent with Scripture, that they "will not forsake the assembling of [them]selves together."  *Id.*

23.     For CHBC, having more than one gathering or assembly means that a local church ceases to be one church.  For instance, in his 2012 book *The Church: The Gospel Made Visible*, Dr. Dever stated that a "biblically ordered church regularly gathers *the whole congregation*" because "without regularly meeting together, it ceases to be a biblically ordered church."  *Id.* at 135 (emphasis added).

24.     Prior to the COVID-19 outbreak, CHBC's leaders had made a convictional choice not to hold multiple services, instead capping attendance at the capacity of its auditorium.  After the COVID-19 outbreak, on March 13, 2020, Dr. Dever decided not to live stream sermons for his congregation during the COVID-19 pandemic because "a video of a sermon is not a substitute for

a covenanted congregation assembling together." *See*

https://twitter.com/MarkDever/status/1238527208702050306.

25.     CHBC thus has a sincerely held religious belief that the physical, corporate

gathering of its entire congregation each Sunday is a central element of religious worship

commanded by the Lord.  CHBC desires to gather for a physical, corporate gathering of believers

in the District of Columbia on Sunday, September 27, 2020, and on subsequent Sundays, and

would do so but for those actions of the Defendants that are the subject of this Complaint.

### C. Prohibitions of Mass Gatherings

26.     On March 11, 2020, Defendant Muriel Bowser, in her official capacity as the

Mayor of the District of Columbia, issued both Mayor's Order 2020-045 (declaring a public

emergency) and Mayor's Order 2020-046 (declaring a public health emergency) due to the

COVID-19 outbreak.

27.     As COVID-19 spread across the country, on March 24, 2020, Mayor Bowser

issued Mayor's Order 2020-053, which mandated the closure of all non-essential businesses and

prohibited all "large gatherings."  The Order defined "large gatherings" as "any event or

convening … that bring together or are likely to bring together ten (10) or more persons at the

same time in a single room or other single confined or enclosed space."  The prohibition on large

gatherings also included all events or activities with ten or more persons in confined outdoor

spaces.

28.     While the Mayor's March 24th Order itself did not specifically mention churches,

temples, mosques, synagogues, or other houses of worship—and thus did not expressly close

them—it did by implication.  As the "Additional Information" contained on the District's

COVID-19 website made clear, churches were not considered an "essential" entity by the

District and were prohibited from performing worship services under the Order:

> **Q: Did the Mayor close churches?**
> No, but large gatherings of ten or more people are prohibited, *so as a practical matter, most churches are not holding services.*  Weddings and funerals may only be 10 or fewer people.  Houses of worship can maintain basic business operations, and many open their doors to people who walk in who want a quiet place to pray alone.  Many congregations are also maintaining their social service programs to deliver essential items like food to people who are at home or helping others get to medical appointments.

29.     Mayor's Order 2020-053 also provided that "[a]ny individual or entity that

knowingly" violated the Order would be "subject to all civil, criminal, and administrative

penalties authorized by law, including sanctions or penalties for violating D.C. Official Code

§ 7-2307, including civil fines, summary suspension or revocation of licensure."

30.     Six days later, on March 30, 2020, Mayor Bowser issued a Stay at Home Order,

directing "[a]ll individuals living in Washington, DC … to stay at their place of residence, except

as specified in this Order."  The Stay at Home Order exempted travel to essential businesses, as

well as to non-essential businesses to maintain minimum business operations.  It also exempted

"essential travel," which did include "[t]ravel required to visit a house of worship."  However, as

the "Frequently Asked Questions on Stay at Home Order" published on the District's official

COVID-19 website made clear, "large gatherings of ten or more people are prohibited, so as a

practical matter, most churches are not holding services."

31.     After multiple extensions of the Stay at Home Order, on May 27, 2020, the Mayor

issued the District's Phase One reopening order, in which "certain activities—where the risk of

transmission has been determined to be low and when strong safeguards are in place—are being

allowed to restart."  While the Stay at Home Order's prohibition on travel was lifted under Phase

One, "[l]arge gatherings of more than ten (10) individuals continue[d] to be prohibited in the District, with the same caveats and exceptions set forth in prior Orders."

32.     The Phase One order also exempted new types of gatherings, however. For instance, barbershops and hair salons were allowed to operate with no cap on the number of people allowed in a building or room so long as there was no more than one customer per stylist and customers maintained six feet separation from each other. Outdoor dining at licensed establishments was also allowed, as was going to a farmers' market, park, dog park, tennis court, or track, all with no limit on the number of persons. The only limits were that individual groups of persons had to consist of ten or fewer (though multiple groups of ten persons could be in the park or field, etc.), and social distancing guidelines of six feet between groups needed to be maintained.

33.     Notably, in Phase One, the District allowed "streateries" and other outdoor restaurants to operate with no limit on the number of people they could serve, other than what social distancing required and in accordance with Alcoholic Beverage Regulation Administration guidelines. None of these entities were subject to the Mayor's large gathering prohibition. And even the social distancing guidelines were different for outdoor restaurants than they were for other entities: the "physical distancing and safeguard measures … generally include minimum buffers of *4 and 6 feet* between pedestrians/customers and seating area/tables," as opposed to six feet between persons or groups in non-exempted buildings. As of September 11th, there are 583 Streatery registrations, which includes 439 alcohol licensees, 55 restaurants without alcohol, 20 retailers, and 69 community organization requests.

34.     Under the Phase One Order, the Mayor did not remove the prohibition on gatherings of ten or more persons, indoors or outdoors, with regard to houses of worship.

Instead, they remained under threat of "civil and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines or summary suspension or revocation of licenses."

35.    Effective June 22, 2020, the Mayor announced Phase Two of the District's reopening via Mayor's Order 2020-075.  Phase Two repealed the large gathering prohibition in place since March 24th and replaced it with a prohibition on mass gatherings of over fifty persons, subject to exceptions.  One of these new exceptions was for indoor dining.  In Phase Two, licensed restaurants could now open indoor seating at 50% capacity, while outdoor dining had no capacity restrictions, subject only to distancing guidelines.  Other new exceptions in Phase Two included:

- Gyms and other fitness facilities opened, with no maximum capacity limit, subject only to a capacity requirement of five people per 1,000 square feet of space.

- Childcare centers could resume operations with the same staff/child ratios as prior to the COVID-19 pandemic.  While the number of children allowed to be grouped in one room indoors was limited to 10-11 people (11 with a second staff member), there is no limit on the total amount of persons allowed in a childcare building.  For outdoor activities, groups of 10-11 may run and play together, with no limit on the total number of groups that may be in an outdoor area, other than requiring groups to stand greater than six feet apart.

- Summer camps have similar group restrictions as childcare facilities, but they are allowed to have groups of 12-13, and again, have no limits on the total number of groups that may be inside a building or in an outdoor space, other than requiring separate groups to socially distance from each other.

36.     By contrast, in Phase Two, "[p]laces of worship are encouraged to continue providing virtual services as everyone is safer at home.  **Participation limited to virtual worship services is especially recommended for older adults and people of all ages with chronic medical conditions who are at higher risk for severe illness from COVID-19.**" Houses of worship, which have a constitutional right to gather, are the ***only*** entity expressly encouraged to continue meeting virtually in Phase Two.

37.     In addition to officially and expressly encouraging congregants to not meet in-person and exercise their constitutional rights to worship in-person as a corporate body, Defendants also subjected places of worship to a capacity restriction of "fifty percent (50%) of the capacity of the facility or space where the service is occurring as set forth in its Certificate of Occupancy, or one hundred (100) persons, whichever is fewer.  Groups of persons attending together must not exceed ten (10) persons.  Each group must be seated at least six (6) feet from each other group."  Importantly "[t]hese limits apply to indoor and outdoor services."

38.     Violators of Mayor's Order 2020-075 are "subject to civil and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines or summary suspension or revocation of licenses."

39.     The public emergency and public health emergency declared by Mayor Bowser in March 2020 have been extended several times.  Most recently, Mayor's Order 2020-079, issued on July 22, 2020, extended the states of emergency from July 24, 2020 to October 9, 2020.

40.     As of the date of the filing of this Complaint, the District remains in Phase Two of reopening.  Mayor Bowser has said that there is no timetable for the District to enter the third phase of its reopening plan; her latest suggestion is that it would not occur until children are back in school (which is tentatively scheduled for November).

41.    Even in Phase Three, however, houses of worship would be capped at 250 attendees according to recommendations from the ReOpen DC Advisory Group, a group constituted by Mayor Bowser to provide recommendations for reopening that can then be operationalized by Defendants.

42.    According to the current ReOpen DC recommendations, the 250-attendee limit would only be lifted during Phase Four, which would require an effective COVID-19 vaccine or therapy.

### D. Mass Protests

43.    From May 29, 2020 to June 22, 2020, the District of Columbia was in Phase One of reopening during which large gatherings of more than ten individuals were prohibited, subject to certain exceptions.  Mass protests were not such an exception.

44.    On Saturday, June 6, 2020, however, tens of thousands of people gathered for a mass protest in and around 16th and H Streets, NW in the District.

45.    Mayor Bowser attended the mass protest and said to the thousands in attendance, "It's so wonderful to see everyone peacefully protesting, wearing their masks."

46.    Defendants further facilitated the June 6 mass protest by closing dozens of city streets to vehicular traffic on that day in order to accommodate the "First Amendment demonstrations."

47.    On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the June 6 mass protest for a violation of the Phase One prohibition on large gatherings.

48.    On Sunday, June 7, 2020, thousands of protesters again converged in the District for a mass protest.  This protest included a march of several hundred people from Southeast

Washington along a closed-down street leading to the White House with an escort of police on motorcycles.  The march began with a Christian invocation and prayer for forgiveness by David Platt, pastor of one of the nation's largest and most high-profile evangelical churches, McLean Bible Church.  As the march proceeded, participants sang, prayed, and banged tambourines.  The march proceeded to the reflecting pool on the west side of the Capitol building, where the participants gathered in close proximity for an hour to hear from a variety of speakers.

49.     On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the June 7 mass protest for a violation of the Phase One prohibition on large gatherings.

50.     On Sunday, June 14, 2020, thousands of protesters participated in a mass protest at 16th and H Streets, NW.  This protest took the form of a religious ceremony, with thousands of worshipers praying, protesting, kneeling and dancing on the street.  The *Washington Post* described the event as transforming the area "into a church" and as "a kaleidoscope of prayers, chants, singing and preaching from Jewish, Hindu, Muslim, Sikh and Christian faith leaders who joined in a multifaith effort to bless the protest movement."  At this mass protest, people bunched up in places.

51.     Defendants endorsed and facilitated the June 14 mass protests by closing dozens of city streets to vehicular traffic in order to accommodate the First Amendment demonstrations.

52.     On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the June 14 mass protest for a violation of the Phase One prohibition on mass gatherings.

53.     On June 19-21, 2020, many mass protests coinciding with Juneteenth took place throughout the District of Columbia.  One of the protests on June 19 was a march organized by

the Washington Wizards and Washington Mystics professional basketball teams, attended by a crowd of thousands.  At another June 19 Juneteenth mass protest, hundreds of people marched from Freedom Plaza to the United States Department of Education.  The mass protests continued on Saturday, June 20 and Sunday, June 21, including a convention of hundreds on the National Mall.

54.     Defendants endorsed and facilitated the Juneteenth mass protests by closing dozens of city streets to vehicular traffic on those three days in order to accommodate the First Amendment demonstrations.

55.     On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the Juneteenth mass protests for a violation of the Phase One prohibition on large gatherings.

56.     Since June 22, 2020, the District of Columbia has been subject to Defendants' Phase Two restrictions, which prohibit gatherings of more than 50 people.  On July 31, 2020, however, Mayor Bowser issued guidance for persons planning to attend the Commitment March, an August 28, 2020 mass gathering of well in excess of 50 people.  Mayor Bowser's guidance did not reference Defendants' Phase Two restrictions on mass gatherings or indicate that the Commitment March would be subject to these restrictions.

57.     On August 17, 2020, Mayor Bowser announced that the Commitment March had been "re-imagined" and that the march would take the form of "a seated event where the number of seats would be limited, people would be checked going into the seated area."

58.     On August 28, 2020, thousands of protesters gathered at the Lincoln Memorial to participate in the Commitment March, which lasted approximately five hours.

- 14 -

59.     Defendants further endorsed and facilitated the Commitment March by announcing that dozens of city streets would close to vehicular traffic to accommodate the event.

60.     On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the Commitment March for a violation of the Phase Two prohibition on mass gatherings.

### E. CHBC's Attempts to Meet in the District

61.     On June 10, 2020, CHBC submitted a request to the District of Columbia for a waiver from Defendants' restrictions on large gatherings.  The request noted that, based on CHBC's "theological convictions," its "ability to meet together in person as a church is of the essence of what it means to be a church."  It also stated that, for all practical purposes, "if a church cannot meet in an assembly it does not exist."  It explained that "since the Mayor first requested that churches cease holding services, it has been [CHBC's] theological judgment not to hold any services—online or in person—nor have we been able to perform the Christian ordinances of baptism or communion."  This has been, the request concluded, "a substantial burden on" CHBC's congregation, "most of whom live in the District of Columbia."  The request asked for "a waiver so that [CHBC] can meet outside of a building in a manner consistent with the current guidance applicable to outdoor restaurants."  In the request, CHBC pledged to "ensure that each household is distanced by at least six feet" and "instruct all individuals above the age of ten years to wear masks for the duration of the service."

62.     During the course of June, Jamie Dunlop, a pastor at CHBC, had multiple conversations with Thomas Bowen in Mayor Bowser's Office of Religious Affairs.

63.     After several months passed and CHBC had not received a response on its waiver request (or any other communication from the Mayor's Office), CHBC submitted an updated

request on September 1, 2020.  The updated request noted that CHBC had been told that it could

use an outdoor space near RFK Stadium that "would very comfortably accommodate" its

congregation, but only if CHBC had a waiver from the District of Columbia government.  The

request again asked for "a waiver so that [CHBC] can meet outdoors in a manner consistent with

the current guidance applicable to outdoor service at restaurants."  CHBC pledged to "ensure that

each household is distanced by at least six feet" and "instruct all individuals without medical

exemptions above the age of two years to wear masks for the duration of the service."

64.     On September 2, 2020, Pastor Dunlop from CHBC contacted Nichole Opkins

from Councilmember Charles Allen's office, informing her that CHBC had never received a

reply to its June 10 waiver application and that CHBC had submitted an updated request the day

before.

65.     On September 15, 2020, the District of Columbia rejected CHBC's request for a

waiver.  The denial letter thanked CHBC for providing information about its "social distancing

plan, and other measures to mitigate the risk of spread of COVID-19."  Noting that the Phase

Two Order's capacity limits for places of worship were "double the District's current prohibition

on mass gatherings of more than fifty (50) persons," the letter stated that "[w]aivers for places of

worship above that expanded capacity are not being granted at this time."  To the extent CHBC's

request was to operate above those gathering limits, the letter concluded, its request "is denied."

66.     Meanwhile, on June 27, 2020, the District of Columbia granted a waiver request

for a different type of expressive gathering protected by the First Amendment.  Earlier in June,

two local companies had requested a waiver to operate a pop-up drive-in movie theater at RFK

Stadium in a desire "to bring people together in D.C."  The D.C. Homeland Security and

Emergency Management Agency approved the waiver request, allowing the drive-in gathering to hold up to 350 socially distanced vehicles.

67.     The District of Columbia Department of Health has been tracking and reporting the incidence of COVID-19 infections in the District.  According to the Department of Health website, the District has experienced 334 new cases of COVID-19 in the last week, out of a city with a population of over 705,000.  The District also has reported hitting its reopening goals for ability to contact trace new cases, ability to contact trace close contacts, sustained low positivity rate, sustained low transmission rate, and utilization of hospitals.

68.     Despite the reduced presence of COVID-19 in its community, CHBC remains committed to emphasizing safety in its gatherings with social distancing precautions in order to ensure the safety and well-being of its congregants.  Specifically, CHBC will consider health officials' recommended precautions in the conduct of its services.

69.     These precautions will provide strong protection for the health of the church community and others by preventing contact and ensuring against the transmission of disease through the service.

### V. First Cause of Action
### The Free Speech Clause of the First Amendment to the U.S. Constitution

70.     Paragraphs 1 through 69 are hereby incorporated as if set forth fully herein.

71.     The First Amendment of the Constitution prohibits governmental action "abridging the freedom of speech."  The Free Speech Clause applies "with equal vigor" to the District of Columbia.  *Espresso, Inc. v. Dist. of Columbia*, 884 F. Supp. 7, 9 (D.D.C. 1995).

72.     Under that Clause, a government, including a municipal government, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  CHBC's religious worship gatherings

are quintessential protected expression.  *See, e.g.*, *Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (recognizing that forum restriction on an organization that taught Bible verses to children via stories, games, and prayer was a restriction on the freedom of speech).

73.   Defendants' selective enforcement of its rules against mass gatherings has created a de facto exemption for mass protests.  The existence of a de facto exemption is further evidenced by Mayor Bowser's encouragement of (and participation in) the protests while discouraging others from violating the mass gathering limitations.

74.   An exemption even from a permissible regulation of speech diminishes the credibility of the government's rationale for restricting speech in the first place.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 51-53 (1994).  When a law or policy is selectively enforced or subject to exceptions, it suggests that content discrimination is afoot.  *Id.* at 52.

75.   A content-based exemption from a ban is no less a content-based distinction because it is phrased as exempting certain speech from a ban rather than as imposing the restriction only on the burdened class of speech.  *See City of Ladue*, 512 U.S. at 48-53; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993).

76.   Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163.

77.   Defendants' actions are not "narrowly tailored" because they burden substantially more speech than is necessary to further the government's legitimate interests.  *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  CHBC is willing to follow social distancing and other hygiene requirements, yet Defendants forbid CHBC from holding services with more than 100 attendees even though they allow far larger mass protests.  In other words, Defendants have

shown they can accomplish their interest in more narrow ways than outright forbidding religious gatherings of greater than 100 attendees.

78.     Creating an exception for mass protests and not other types of First Amendment activities is constitutionally forbidden content-based discrimination and thus violates CHBC's free speech rights.  *See Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984).

## VI. Second Cause of Action
### The Freedom of Assembly Clause of the First Amendment to the U.S. Constitution

79.     Paragraphs 1 through 78 are hereby incorporated as if set forth fully herein.

80.     The First Amendment of the Constitution protects the "right of the people peaceably to assemble."

81.     The Supreme Court has long recognized that the First Amendment's freedom of assembly includes religious assemblies.  *See NAACP v. Alabama*, 357 U.S. 449, 460-62 (1958). "Joining a lawful organization, like attending a church, is an associational activity that comes within the purview of the First Amendment …. 'Peaceably to assemble' as used in the First Amendment necessarily involves a coming together, whether regularly or spasmodically." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 562 (1963) (Douglas, J., concurring) (noting that while, historically, the right to assembly was considered part of the right to petition the government for a redress of grievances, the right to assembly has since become "equally fundamental" with the right to free speech and thus applies to "attending a church").

82.     "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights."  *Whitney v. California*, 274 U.S. 357, 373 (1927).  When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less

- 19 -

restrictive alternative is available. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

83.     By denying Plaintiff the ability to assemble via an in-person church service in numbers greater than 100, whether indoors or outdoors, Defendants are in violation of the Freedom of Assembly Clause.  Defendants cannot meet the no-less-restrictive-alternative test. Social distancing precautions are appropriate to limit the spread of COVID-19.  Imposing more-restrictive requirements that target only churches and their services is not the least restrictive means of achieving Defendants' public safety goal.

84.     Requiring Plaintiff to abstain from its religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiff's constitutional right peaceably to assemble.

### VII. Third Cause of Action
### Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1.

85.     Paragraphs 1 through 84 are hereby incorporated as if set forth fully herein.

86.     RFRA states that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1; *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 705 (2014).

87.     RFRA's "compelling interest test" is a form of strict scrutiny that "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is

being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006).

88.    The District of Columbia, as an enclave of the federal government, is a "covered entity" under RFRA.  42 U.S.C. § 2000bb-2(2).

89.    In order to make the required "demonstrat[ion]" to justify a burden of religion, Defendants must satisfy both the evidentiary and persuasive burden.  42 U.S.C. §§ 2000bb-2(3).

90.    RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000bb–2(4) (citing 42 U.S.C. § 2000cc–5).  In *Hobby Lobby*, the United States Supreme Court stated that the exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reason."  573 U.S. at 710 (citing *Employment Division v. Smith,* 494 U.S. 872, 877 (1990)).

91.    Gathering as one church in a single worship service is an essential component of Plaintiff's exercise of religion.

92.    A compelling interest includes "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).  And the least-restrictive-means standard is "exceptionally demanding."  *Hobby Lobby*, 573 U.S. at 728.  To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector.  *Id.*

93.    By denying Plaintiff the ability to hold an in-person church service, Defendants are in violation of RFRA.

94.    Defendants cannot meet the least-restrictive-means test.  Social distancing precautions are appropriate to limit the spread of COVID-19.  Imposing more-restrictive

requirements that target only churches and their services, and not similar mass gatherings, is not the least restrictive means of achieving Defendants' public safety goal. Defendants employ substantially less restrictive means to regulate mass protests, which register attendance figures far greater than those permitted at church services.

## VIII. Fourth Cause of Action
### The Free Exercise Clause of the First Amendment to the U.S. Constitution

95.     Paragraphs 1 through 94 are hereby incorporated as if set forth fully herein.

96.     The First Amendment of the Constitution protects the "free exercise" of religion. Fundamental to this protection is the right to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts . . . [such as the] freedom of worship and assembly.").

97.     As the Supreme Court has noted, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

98.     Gathering as one church in a single worship service is an essential component of Plaintiff's exercise of religion.

99.     Defendants prohibit in-person religious services of greater than 100 people, under penalty of law, and have thus substantially burdened Plaintiff's religious exercise.

100.    "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Id.* at 533.

101.    Defendants' restrictions have specifically and explicitly targeted in-person religious gatherings and are thus not neutral on their face.

102.     Relatedly, government action is not generally-applicable if its prohibitions substantially under-include non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect.  *Id.* at 542–46.

103.     Defendants' prohibition of in-person church services in excess of 100 people is not generally-applicable.  There are numerous business organizations and other entities that Defendants are not cracking down on where far more people come into closer contact with less oversight.  Moreover, Defendants systematically permit and endorse much larger gatherings, numbering in the tens of thousands, for the purposes of mass protests.

104.     Laws and government actions that burden religious practice and are either not neutral or not generally-applicable must satisfy a compelling governmental interest and be narrowly tailored to achieve that end.  *See id.* at 546.

105.     Defendants' mandate is not "narrowly tailored" because the ban on in-person gatherings in excess of 100 people for religious services is absolute, not accounting for services, like Plaintiff's, where social distancing precautions are carefully adhered to, and thus satisfy the public health concerns to which the guidelines are directed.

106.     Requiring Plaintiff to abstain from its religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiff's constitutional right to free exercise of its religion.

### IX. Fifth Cause of Action
### The Due Process Clause of the Fifth Amendment to the U.S. Constitution

107.     Paragraphs 1 through 106 are hereby incorporated as if set forth fully herein.

108.     The Fifth Amendment of the Constitution prohibits governmental deprivation of "life, liberty, or property, without due process of law."  "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any

person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013).

This Fifth Amendment protection applies with full force to the District of Columbia. *See Bolling v. Sharpe*, 347 U.S. 497 (1954).

109.    To establish an equal protection claim under the Fifth Amendment, the plaintiff must plead and prove that the defendant acted with discriminatory purpose on account of race, religion, or national origin. *See Anderson v. Holder*, 691 F. Supp. 2d 57, 61-62 (D.D.C. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

110.    Mayor Bowser has acknowledged that her selective enforcement of the mass gathering restrictions is motivated by a discriminatory purpose. As she admitted in an MSNBC interview, the discriminatory enforcement of her ban on large gatherings is based on her preference for social "protest" over religious worship, and she mistakenly asserts that the Constitution supports her content-based bias.

111.    Similarly, the District of Columbia, in rejecting Plaintiff's application for a waiver, responded that it was not considering waivers "for places of worship." The District did not claim that it is categorically denying waiver requests for all mass gatherings regardless of expressive purpose; that categorical denial applies only to churches. Defendants have thus explicitly tied their denial of Plaintiff's waiver to the expressive content of the gathering, rather than the circumstances under which it is conducted.

112.    Defendants' intentional differential treatment of places of worship from other similarly situated individuals and entities has denied Plaintiff equal protection of the laws, violating Plaintiff's Fifth Amendment guarantee of due process.

### X. Prayer for Relief

WHEREFORE, Plaintiff requests this Court enter an order:

a.  Declaring that Defendants have unlawfully burdened Plaintiff's free speech rights, in violation of the Free Speech Clause of the First Amendment to the U.S. Constitution;

b.  Declaring that Defendants have unlawfully burdened Plaintiff's right to peaceably assemble, in violation of the Freedom of Assembly Clause of the First Amendment to the U.S. Constitution;

c.  Declaring that Defendants have unlawfully burdened Plaintiff's religious free exercise rights, in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq*.;

d.  Declaring that Defendants have unlawfully burdened Plaintiff's religious free exercise rights, in violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution;

e.  Declaring that Defendants have denied Plaintiff equal protection of the laws, in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

f.  Entering a temporary restraining order, preliminarily enjoining, and permanently enjoining Defendants from prohibiting Plaintiff from physically gathering as a congregation in the District of Columbia if conducted with appropriate social distancing practices;

g.  Awarding Plaintiff costs and reasonable attorneys' fees and expenses; and

h.  Granting Plaintiff all such other and further relief as the Court deems just and proper.

Dated: September 22, 2020                 Respectfully submitted,

                                          */s/ Matthew T. Martens*
                                          Matthew T. Martens (D.C. Bar No. 1019099)
                                          Kevin Gallagher (D.C. Bar No. 1031415)*
                                          Matthew E. Vigeant (D.C. Bar. No. 144722)*
                                          Andrew Miller (D.C. Bar No. 1644997)*
                                          WILMER CUTLER PICKERING HALE AND
                                          DORR LLP
                                          1875 Pennsylvania Avenue, NW
                                          Washington, DC 20006
                                          Tel: (202) 663-6000
                                          Fax: (202) 663-6363
                                          Matthew.Martens@wilmerhale.com
                                          *admission application pending*

                                          Kevin Palmer (*pro hac vice forthcoming*)
                                          WILMER CUTLER PICKERING HALE AND
                                          DORR LLP
                                          60 State Street
                                          Boston, MA 02109
                                          Tel: (617) 526-6000
                                          Fax: (617) 526-5000
                                          Kevin.Palmer@wilmerhale.com

                                          Hiram S. Sasser, III (*pro hac vice forthcoming*)
                                          FIRST LIBERTY INSTITUTE
                                          2001 W. Plano Pkwy., Ste. 1600
                                          Plano, Texas 75075
                                          Tel: (972) 941-4444
                                          Fax: (972) 941-4457
                                          hsasser@firstliberty.org

                                          *Attorneys for Capitol Hill Baptist Church*