## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAPITOL HILL BAPTIST CHURCH,**    |

    |

    **Plaintiff,**    |

    |      **Civil Action No. 1:20-cv-2710**

**v.**    |

    |

**MURIEL BOWSER, in her official**    |
**capacity as Mayor of the District of**    |
**Columbia, and the DISTRICT OF**    |
**COLUMBIA,**    |

    |      **Oral Argument Requested**

    **Defendants**    |


## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................................1

II.    Factual Background ..........................................................................................................4

       A.     The Significance of Gathering to CHBC ...........................................................4

       B.     Prohibition of Mass Gatherings ..........................................................................5

       C.     Mass Protests ......................................................................................................11

       D.     CHBC's Attempts to Meet in the District..........................................................14

III.   Argument and Authorities.............................................................................................17

       A.     CHBC is Likely to Succeed on the Merits of its Free Speech, Freedom of
              Assembly, RFRA, and Free Exercise Claims. ..................................................18

              1.     CHBC is Likely to Succeed on the Merits of its Free Speech Claim
                     under the U.S. Constitution..................................................................18

              2.     CHBC is Likely to Succeed on the Merits of its Freedom of
                     Assembly Claim under the U.S. Constitution.......................................21

              3.     CHBC is Likely to Succeed on the Merits of its Claim under the
                     Religious Freedom Restoration Act......................................................23

              4.     CHBC is Likely to Succeed on the Merits of its Free Exercise
                     Claim under the U.S. Constitution........................................................25

       B.     Enforcement of Defendants' Orders Will Inflict Irreparable Injury on
              CHBC if the TRO is Not Issued. .......................................................................29

       C.     A TRO Would Not Substantially Injure Other Interested Parties.......................29

       D.     The Public Interest in Protecting CHBC's Constitutional Rights Requires
              Entry of a TRO....................................................................................................31

IV.    Conclusion .....................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................................................................19

*Branch Ministries v. Rossotti,*
211 F.3d 137 (D.C. Cir. 2000) .......................................................................................23

*\*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)...................................................................................................23, 24

*Calvary Chapel Dayton Valley v. Sisolak,*
__ F. Supp. 3d __, No. 19A1070, 2020 WL 3488742 (July 24, 2020)..........................20

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .......................................................................................17

*\*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)...........................................................................................26, 27, 28

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993)........................................................................................................19

*\*City of Ladue v. Gilleo,*
512 U.S. 43 (1994)..........................................................................................................19

*De Jonge v. State of Oregon,*
299 U.S. 353 (1937)........................................................................................................22

*Dunn v. Blumstein,*
405 U.S. 330 (1972)........................................................................................................22

*Elrod v. Burns,*
427 U.S. 347 (1976)........................................................................................................29

*Employment Division v. Smith,*
494 U.S. 872 (1972)........................................................................................................24

*Espresso, Inc. v. Dist. of Columbia,*
884 F. Supp. 7 (D.D.C. 1995).......................................................................18, 19, 21, 22

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
170 F.3d 359 (3d Cir. 1999) (Alito, J.) ..........................................................................27

*Gibson v. Fla. Legislative Investigation Comm.*,
    372 U.S. 539 (1963) (Douglas, J., concurring)......................................................................22

*Good News Club v. Milford Central School*,
    533 U.S. 98 (2001)......................................................................19

*Gonzales v. O Centro Espirita Beneficente Uniao*,
    546 U.S. 418 (2006)......................................................................24

*Herndon v. Lowry*,
    301 U.S. 242 (1937)......................................................................22

*Hispanic Affairs Project v. Perez*,
    141 F. Supp. 3d 60 (D.D.C. 2015)......................................................................30

*Lee v. Weisman*,
    505 U.S. 577 (1992)......................................................................24

*Marymount Hosp., Inc. v. Shalala*,
    19 F.3d 658 (D.C. Cir. 1994)......................................................................26

*Maryville Baptist Church, Inc. v. Beshear*,
    957 F.3d 610 (6th Cir. 2020) ...................................................................... *passim*

*McCullen v. Coakley*,
    573 U.S. 464 (2014)......................................................................21

*Members of City of City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)......................................................................19

*NAACP v. State of Alabama*,
    357 U.S. 449 (1958)......................................................................22

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ......................................................................19

*Penkoski v. Bowser*,
    __ F. Supp. 3d __, Case No. 20-cv-01519 (TNM), 2020 WL 4923620
    (D.D.C. Aug. 21, 2020)......................................................................28

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972)......................................................................19

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ......................................................................17

iii

*Quaker Action Grp. v. Hickel*,
    421 F.2d 1111 (D.C. Cir. 1969) ........................................................................29

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ...........................................................................................19

*Sammartano v. First Judicial Dist. Court in and for County of Carson City*,
    303 F.3d 959 (9th Cir. 2002) ............................................................................30

*San Antonio Independent Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ..............................................................................................22

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ...................................................................31

*Schad v. Borough of Mt. Ephraim*,
    452 U.S. 61, 76-77 (1981) ................................................................................15

*Schneider v. State*,
    308 U.S. 147, 163 (1939) ..................................................................................15

*Soos v. Cuomo*,
    __ F. Supp. 3d __, 1:20-cv-651 (GLS/DJS), 2020 WL 4251360
    (N.D.N.Y. June 26, 2020) ...........................................................................20, 30

*Tenafly Eruv Assoc., Inc. v. Borough of Tenafly*,
    309 F. 3d 144 (3d Cir. 2002) ............................................................................27

*Tyndale House Publishers, Inc. v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012) .................................................................29

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..........................................................................................26

*Wagner v. FEC*,
    793 F.3d 1 (D.C. Cir. 2015) .........................................................................26, 27

*Whitney v. California*,
    274 U.S. 357 (1927) ..........................................................................................22

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ..........................................................................................27

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ..........................................................................................24

## Federal Statutes

1 U.S.C. § 1 ...................................................................................................................23

42 U.S.C. § 2000bb, *et seq*. ...........................................................................................3

42 U.S.C. § 2000bb–2(4) ...............................................................................................24

42 U.S.C. § 2000bb-1 .....................................................................................................23

42 U.S.C. § 2000bb-2(2) .................................................................................................23

42 U.S.C. §§ 2000bb-2(3) .........................................................................................23, 24

42 U.S.C. § 2000bb-2(4) .................................................................................................24

42 U.S.C. § 2000cc-5 ......................................................................................................24

D.C. Official Code § 7-2307 ...............................................................................6, 7, 8, 10

## Other Authorities

A.T. Robertson, A GRAMMAR OF THE GREEK NEW TESTAMENT IN THE LIGHT OF
   HISTORICAL RESEARCH (3rd ed. 1919) ..................................................................4

Dever, Mark, *The Church: The Gospel Made Visible* ......................................................5

WASH. POST, "The 2020 March on Washington – 8/28 (FULL STREAM,
   https://www.youtube.com/watch?v=a9FwZJx7aq8 ...................................................14

v

Plaintiff Capitol Hill Baptist Church ("CHBC" or the "Church") moves for a temporary restraining order, and in support thereof, states as follows:[1]

## I.    Introduction

Since February 27, 1878, when the first 31 members of CHBC covenanted together at the corner of 6th and A Streets, NE in the District of Columbia, the Church's members have gathered every Sunday for corporate worship a few blocks from this courthouse.  For CHBC, a weekly in-person worship gathering of the entire congregation is a religious conviction for which there is no substitute.  The Church does not offer virtual worship services, it does not utilize a multi-site model, and it does not offer multiple Sunday morning worship services.  And before this year, the only interruption in the Church's weekly worship gatherings was the three-week period in October 1918 when the District of Columbia "requested" that churches not gather for worship due to the Spanish flu.

In March of this year, District of Columbia Mayor Muriel Bowser issued an executive order that, among other things, prohibited the CHBC congregation from gathering as one for in-person worship, whether indoors or outdoors.  Now, six months later, that ban on CHBC's corporate worship gatherings remains in effect in the District of Columbia.  The Mayor's Orders prohibit gatherings of over 100 people for purposes of worship, even if held outdoors and even if worshippers wear masks and practice appropriate social distancing.  And under the District's four-stage plan, CHBC's in-person worship gatherings will be prohibited until scientists develop either a widely-available vaccine or an effective therapy for COVID-19.

---

[1] CHBC incorporates and adopts by reference each and every allegation in its Original Complaint.

1

By contrast, neighboring states that have suffered far more cases of COVID-19 in recent days—both in sheer numbers and as a proportion of the population—have allowed churches to gather once more with appropriate precautions.  In Virginia, the only mandatory requirements for church services are that families or individuals must be seated at least six feet apart and churches must adhere to certain cleaning and signage requirements.  *See* Martens Decl. Ex. 1 at 36-37.[2] There is no capacity limit for in-person services, either indoors or outdoors.  *Id.*  Similarly, Maryland allows churches to operate at 75% capacity, with no maximum capacity limit, indoors or outdoors.  Martens Decl. Ex. 2 at 4.

In hopes of likewise resuming its corporate worship gatherings in the District of Columbia, CHBC filed an application with the Mayor's Office on June 10, 2020, seeking a waiver from Mayor Bowser's prohibition on large gatherings.  Despite the Church's repeated outreach to the Mayor's Office, both directly and through its city councilman, and a resubmittal of the waiver request on September 1, 2020, the District refused to rule on the Church's application for months before rejecting the application last week, leaving CHBC subject to the Mayor's executive order, the violation of which is punishable by civil and administrative penalties.

Meanwhile, Mayor Bowser and the District of Columbia (collectively, "Defendants") have been discriminatory in their application of the ban on large scale gatherings.  For example, on June 6, 2020, Mayor Bowser appeared personally at an outdoor gathering of thousands of people at the corner of 16th and H Streets, NW and delivered a speech describing the large gathering as "wonderful to see."  Similarly, on four occasions between June and August 2020, the District's

---

[2] Copies of certain materials cited in this brief are attached as Exhibits to the Declaration of Matthew T. Martens filed in support of Plaintiff's Motion for a Temporary Restraining Order filed concurrently herewith (hereinafter, "Martens Decl.").

Metropolitan Police Department closed city streets to accommodate protests and marches of thousands to tens of thousands of people.  And only three weeks ago, the Mayor coordinated with organizers of the Commitment March on Washington to "re-imagine" the five-hour event on the steps of the Lincoln Memorial for several thousand people in attendance to hear an array of speakers.

The Church takes no issue with Defendants' decision to permit these gatherings, which are themselves protected by the First Amendment, and the Church supports this exercise of First Amendment rights.  The Church does, however, take exception to Defendants' decision to favor certain expressive gatherings over others.  The First Amendment protects both mass protests and religious worship.  But Mayor Bowser, by her own admission, has preferred the former over the latter.  When asked why she celebrates mass protests while houses of worship remain closed, she responded that "First Amendment protests and large gatherings are not the same" because "in the United States of America, people can protest."  Martens Decl. Ex. 3.  In other words, the Mayor is intentionally discriminating in her treatment of large gatherings based on whether they have a protest message or a worship message.  This is content-based speech discrimination forbidden by our Constitution.

Faced with the District's discriminatory treatment and with no end in sight to the legal ban on worship gatherings, CHBC's membership reluctantly voted to initiate this lawsuit to reclaim their most fundamental of rights: the right to gather for corporate worship free from threat of governmental sanction.  The District's now six-month ban on CHBC's religious gatherings, even if held outdoors with appropriate precautions, violates multiple clauses of the First Amendment to the United States Constitution as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*  Most notably, the District's application of the Mayor's Order to prohibit

outdoor church worship gatherings—stating that "[w]aivers for places of worship … are not being granted at this time"—while providing governmental assistance to and endorsement of far larger protests held outdoors, constitutes impermissible content-based discrimination in violation of the Free Speech Clause of the First Amendment.   For these reasons and others, Defendants' unconstitutional and illegal treatment of CHBC should be enjoined.

## II.      Factual Background

### A.      The Significance of Gathering to CHBC

For nearly 2,000 years, Christians have gathered each Sunday throughout the year in observance of Christ's resurrection from the dead on the first day of the week, and the physical gathering of the church is central to that celebration.  Indeed, the Greek word translated as "church" in our English versions of the Christian scriptures is the word "ekklesia," which literally means "assembly."   A.T. Robertson, A GRAMMAR OF THE GREEK NEW TESTAMENT IN THE LIGHT OF HISTORICAL RESEARCH (3rd ed. 1919).  The bodily assembly of the church on Sunday to celebrate in a special way Christ's bodily resurrection is of particular importance and significance for Christians.

CHBC takes seriously the scriptural exhortation that believers "not forsak[e] the assembling of ourselves together."  Hebrews 10:25 (KJV).  CHBC has a church covenant, which is a statement of how the church agrees to live as a church.  Dunlop Decl. Ex. 1.[3]  The church covenant is reaffirmed at all members' meetings and before taking communion.  *Id.*  In the church covenant, CHBC members agree, consistent with Scripture, that they "will not forsake the

---

[3] Copies of certain materials cited in this brief are attached as Exhibits to the Declaration of Jamie Dunlop filed in support of Plaintiff's Motion for a Temporary Restraining Order filed concurrently herewith (hereinafter, "Dunlop Decl.").

assembling of [them]selves together." *Id.*  CHBC's members thus pledge to each other that they will not neglect meeting as one distinct body together in one place.

For CHBC, having more than one gathering or assembly means that a local church ceases to be one church.  For instance, in his 2012 book *The Church: The Gospel Made Visible*, Dr. Mark Dever,[4] CHBC's senior pastor for more than 25 years, stated that a "biblically ordered church regularly gathers *the whole congregation*" because "without regularly meeting together, it ceases to be a biblically ordered church."  *See* Dunlop Decl. Ex. 3 at 135 (emphasis added).  CHBC leaders have thus made a convictional choice not to hold multiple services, capping their pre-COVID-19 attendance at the capacity of their auditorium.  Dunlop Decl. ¶ 6.  And on March 13, 2020, Dr. Dever decided not to live stream sermons for his congregation during the COVID-19 pandemic because "a video of a sermon is not a substitute for a covenanted congregation assembling together."  Martens Decl. Ex. 4.

CHBC believes that if the Bible is the cornerstone of its church, "membership is the cement" that holds the church together.  Dunlop Decl. Ex. 4.  As of the date of the filing of the Complaint, CHBC has 853 members.  Dunlop Decl. ¶ 5.  On a typical Sunday prior to the outbreak of COVID-19, CHBC had approximately 1,000 people attend its Sunday morning worship service.  *Id.* ¶ 6.

**B.**     **Prohibition of Mass Gatherings**

On March 11, 2020, Defendant Muriel Bowser, in her official capacity as the Mayor of the District of Columbia, issued both Mayor's Order 2020-045 (declaring a public emergency) and Mayor's Order 2020-046 (declaring a public health emergency) due to the COVID-19 outbreak.

---

[4] Dr. Dever earned his doctorate in Ecclesiastical History from Cambridge University.  *See* Dunlop Decl. Ex. 2.

Martens Decl. Ex. 5, Ex. 6.  As COVID-19 spread across the country, on March 24, 2020, Mayor Bowser issued Mayor's Order 2020-053, which mandated the closure of all non-essential businesses and prohibited all "large gatherings."  Martens Decl. Ex. 7.  Order 2020-053 defined "large gatherings" as "any event or convening … that bring together or are likely to bring together ten (10) or more persons at the same time in a single room or other single confined or enclosed space."  *Id*.  The prohibition on large gatherings also included all events or activities with ten or more persons in confined outdoor spaces.  *Id.*

While the Mayor's March 24th Order itself did not specifically mention churches, temples, mosques, synagogues, or other houses of worship—and thus did not expressly close them—it did by implication.  As the "Additional Information" contained on the District's COVID-19 website made clear, churches were not considered an "essential" entity by the District and were, for all intents and purposes, prohibited from performing worship services under the Order:

> **Q: Did the Mayor close churches?**
>
> No, but large gatherings of ten or more people are prohibited, *so as a practical matter, most churches are not holding services.* Weddings and funerals may only be 10 or fewer people.  Houses of worship can maintain basic business operations, and many open their doors to people who walk in who want a quiet place to pray alone.  Many congregations are also maintaining their social service programs to deliver essential items like food to people who are at home or helping others get to medical appointments.

Martens Decl. Ex. 8 (emphasis added).  Mayor's Order 2020-053 also provided that "[a]ny individual or entity that knowingly" violated the Order would be "subject to all civil, criminal, and administrative penalties authorized by law, including sanctions or penalties for violating D.C.

6

Official Code § 7-2307, including civil fines, summary suspension or revocation of licensure."
Martens Decl. Ex. 7.

Six days later, on March 30, 2020, Mayor Bowser issued a Stay at Home Order, directing "[a]ll individuals living in Washington, DC … to stay at their place of residence, except as specified in this Order." Martens Decl. Ex. 9. The Stay at Home Order exempted travel to essential businesses, as well as to non-essential businesses to maintain minimum business operations. *Id*. It also exempted "essential travel," which did include "[t]ravel required to visit a house of worship." *Id*. However, as the "Frequently Asked Questions on Stay at Home Order" published on the District's official COVID-19 website made clear, "large gatherings of ten or more people are prohibited, so as a practical matter, most churches are not holding services." Martens Decl. Ex. 10.

After multiple extensions of the Stay at Home Order, on May 27, 2020, the Mayor issued the District's Phase One Reopening Order, in which "certain activities—where the risk of transmission has been determined to be low and when strong safeguards are in place—are being allowed to restart." Martens Decl. Ex. 11. Under the Phase One Order, "[l]arge gatherings of more than ten (10) individuals continue[d] to be prohibited in the District, with the same caveats and exceptions set forth in prior Orders." *Id*. at 3. The Phase One Order also exempted new types of gatherings, however. For instance, barbershops and hair salons were allowed to operate with no cap on the number of people allowed in a building or room so long as there was no more than one customer per stylist and customers maintained six feet separation from each other. *Id*. at 4. Outdoor dining at licensed establishments was also allowed, as was going to a farmers' market, park, dog park, tennis court, or track, all with no limit on the number of persons. *Id.* at 5-6. The only limits were that individual groups of persons had to consist of ten or fewer (though multiple

groups of ten persons could be in the park or field, etc.), and social distancing guidelines of six feet between groups needed to be maintained.  *Id.*

Notably, in Phase One, the District allowed "streateries" and other outdoor restaurants to operate with no limit on the number of people they could serve, other than what social distancing required and in accordance with Alcoholic Beverage Regulation Administration guidelines.[5] Martens Decl. Ex. 11.  None of these entities were subject to the Mayor's large gathering prohibition.  Martens Decl. Ex. 14.  And even the social distancing guidelines were different for outdoor restaurants than they were for other entities:  the "physical distancing and safeguard measures … generally include minimum buffers of *4 and 6 feet* between pedestrians/customers and seating area/tables," as opposed to six feet between persons or groups in non-exempted buildings.  *Id.*  As of September 11th, there are 583 Streatery registrations, which includes 439 alcohol licensees, 55 restaurants without alcohol, 20 retailers, and 69 community organization requests.  Martens Decl. Ex. 15.

Under the Phase One Order, the Mayor did not remove the prohibition on gatherings of ten or more persons, indoors or outdoors, with regard to houses of worship.  Martens Decl. Ex. 11. Instead, they remained under threat of "civil and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines or summary suspension or revocation of licenses."  *Id.*

---

[5] On September 10, 2020, the Centers for Disease Control and Prevention released a report on close contact exposures associated with COVID-19.  Martens Decl. Ex. 12.  The report studied two groups of people that generally reported similar activities, such as going to church, gyms, and stores, with one exception: going out to eat or having drinks at a bar or coffee shop. Those who tested positive for COVID-19 were approximately twice as likely to have reported dining at a restaurant than were those with negative test results.  A co-author of the report said that the increased risk "makes sense" because it is "easy to wear a mask in stores or in places of worship, but it's nearly impossible to do so while eating or drinking."  Martens Decl. Ex. 13.

Effective June 22, 2020, the Mayor announced Phase Two of the District's reopening via Mayor's Order 2020-075.  *See* Martens Decl. Ex. 16.  Phase Two repealed the large gathering prohibition in place since March 24th and replaced it with a prohibition on mass gatherings of over fifty persons, subject to exceptions.  *Id.*; *see also* Martens Decl. Ex. 17.  One of these new exceptions was for indoor dining.  In Phase Two, licensed restaurants could now open indoor seating at 50% capacity, while outdoor dining had no capacity restrictions, subject only to distancing guidelines.  Martens Decl. Ex. 18.  Other new exceptions in Phase Two included:

- Gyms and other fitness facilities opened, with no maximum capacity limit, subject only to a capacity requirement of five people per 1,000 square feet of space.  *See* Martens Decl. Ex. 19.

- Childcare centers could resume operations with the same staff/child ratios as prior to the COVID-19 pandemic.  While the number of children allowed to be grouped in one room indoors was limited to 10-11 people (11 with a second staff member), there is no limit on the total amount of persons allowed in a childcare building.  For outdoor activities, groups of 10-11 may run and play together, with no limit on the total number of groups that may be in an outdoor area, other than requiring groups to stand greater than six feet apart.  *See* Martens Decl. Ex. 20.

- Summer camps have similar group restrictions as childcare facilities, but they are allowed to have groups of 12-13, and again, have no limits on the total number of groups that may be inside a building or in an outdoor space, other than requiring separate groups to socially distance from each other.  *See* Martens Decl. Ex. 21.

By contrast, in Phase Two, "[p]laces of worship are encouraged to continue providing virtual services as everyone is safer at home.  **Participation limited to virtual worship services**

9

**is especially recommended for older adults and people of all ages with chronic medical conditions who are at higher risk for severe illness from COVID-19.**"  Martens Decl. Ex. 22 (emphasis in original).  Houses of worship, which have a constitutional right to gather, are the ***only*** entities expressly encouraged to continue meeting virtually in Phase Two—not restaurants, bars, gyms, museums, or barbershops; ***only*** houses of worship.  *See generally* Martens Decl. Ex. 15.

In addition to officially and expressly encouraging congregants to not meet in-person and exercise their constitutional rights to worship in-person as a corporate body, Defendants also subjected places of worship to a capacity restriction of "fifty percent (50%) of the capacity of the facility or space where the service is occurring as set forth in its Certificate of Occupancy, or one hundred (100) persons, whichever is fewer.  Groups of persons attending together must not exceed ten (10) persons.  Each group must be seated at least six (6) feet from each other group."  Martens Decl. Ex. 22.  Importantly, "[t]hese limits apply to indoor and outdoor services."  *Id.*  Mayor Bowser has acknowledged that "[s]ome would say" that her limitations on *outdoor* church services are "more restrictive" than her limitations on *indoor* retail establishments.  Martens Decl. Ex. 23.  Violators of the Phase Two Order are "subject to civil and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines or summary suspension or revocation of licenses."  Martens Decl. Ex. 16.

The public emergency and public health emergency declared by Mayor Bowser in March 2020 have been extended several times.  Most recently, Mayor's Order 2020-079, issued on July 22, 2020, extended the states of emergency from July 24, 2020 to October 9, 2020.  *See* Martens Decl. Ex. 24.  As of the date of the filing of the Complaint, the District remains in Phase Two of reopening. Mayor Bowser has said that there is no timetable for the District to enter the third phase of its reopening plan, *see* Martens Decl. Ex. 25; her latest suggestion is that it would not occur

10

until children are back in school (which is tentatively scheduled for November), *see* Martens Decl. Ex. 26.  Even in Phase Three, however, houses of worship would be capped at 250 attendees, *see* Martens Decl. Ex. 27, according to recommendations from the ReOpen DC Advisory Group, a group constituted by Mayor Bowser to provide recommendations for reopening that can then be "operationalize[d]" by Defendants, *see, e.g.*, Martens Decl. Ex. 11.  According to the current ReOpen DC recommendations, the 250-attendee limit would only be lifted during Phase Four, which would require an effective COVID-19 vaccine or therapy.  Martens Decl. Ex. 28.

## C.    Mass Protests

From May 29, 2020 to June 22, 2020, the District of Columbia was in Phase One of reopening during which large gatherings of more than ten individuals were prohibited, subject to certain exceptions.  Mass protests were not such an exception.  On Saturday, June 6, 2020, however, "tens of thousands" of people gathered for a mass protest in and around 16th and H Streets NW in the District.  Martens Decl. Ex. 29.  While this large gathering was prohibited by the Phase One restrictions, Defendants declined to enforce the restrictions against participants.  To the contrary, Mayor Bowser attended the mass protest and said to the thousands in attendance, "It's so wonderful to see everyone peacefully protesting, wearing their masks."  *Id.*  Further, Defendants closed dozens of city streets to vehicular traffic on that day in order to accommodate the "First Amendment demonstrations."  Martens Decl. Ex. 30.  On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the June 6 mass protest for a violation of the Phase One prohibition on large gatherings.[6]

---

[6] CHBC is not suggesting or implying that such citations should have been given but only that, to the best of CHBC's knowledge, Defendants have not been enforcing their large gathering prohibitions against participants in mass protests.

The next day (Sunday), "thousands of protestors again converged in the nation's capital" for a mass protest.  Martens Decl. Ex. 31.  This protest included a march of "several hundred people" from Southeast Washington along "closed-down streets leading to the White House" with an "escort of police on motorcycles."  *Id.*  The march began with a Christian invocation and prayer for forgiveness by David Platt, "pastor of one of the nation's largest and most high-profile evangelical churches, McLean Bible."  *Id.*  As the march proceeded, participants "sang, prayed, and banged tambourines."  *Id.*  Several hundred participants gathered at the Capitol Reflecting Pool where prayers were offered.  *Id.*  Again, on information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the June 7 mass protest for a violation of the Phase One prohibition on large gatherings.

On Sunday, June 14, 2020, "thousands" of protestors participated in a mass protest at 16th and H Streets, NW.  This protest took the form of a religious ceremony, with thousands of "worshipers praying, protesting, kneeling and dancing" on the street, which was "transformed into a church."  Martens Decl. Ex. 32.  The *Washington Post* described the event as a "kaleidoscope of prayers, chants, singing and preaching from Jewish, Hindu, Muslim, Sikh and Christian faith leaders who joined in a multifaith effort to bless the protest movement."  *Id.*  At this mass protest, "[p]eople bunched up in places."  *Id.*  Defendants again closed dozens of city streets to vehicular traffic in order to accommodate the "First Amendment demonstrations."  Martens Decl. Ex. 33.  When asked about the COVID-19 implications of the protests, Mayor Bowser stated that she was "going to support these peaceful demonstrations" even though government officials did not "know what the impact of these demonstrations will be on our COVID experience in D.C."  Martens Decl. Ex. 34.  On information and belief, Defendants appropriately recognized First Amendment rights

and did not cite a single participant in the June 14 mass protest for a violation of the Phase One prohibition on large gatherings.

On June 19-21, 2020, many mass protests coinciding with Juneteenth took place throughout the District.  One of the Juneteenth protests on June 19 was a march organized by the Washington Wizards and Washington Mystics professional basketball teams, attended by a "crowd of thousands."  Martens Decl. Ex. 35.  At another June 19 Juneteenth mass protest, "hundreds" of people marched from Freedom Plaza to the United States Department of Education.  Martens Decl. Ex. 36.  And "hundreds" of people gathered the next two days on the National Mall for further Juneteenth protests.  *See* Martens Decl. Ex. 37, Ex. 38.  Defendants again closed dozens of city streets to vehicular traffic in order to accommodate the "First Amendment demonstrations." Martens Decl. Ex. 39.  On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the Juneteenth mass protests for a violation of the Phase One prohibition on large gatherings.

Since June 22, 2020, the District has been subject to Defendants' Phase Two restrictions, which prohibit gatherings of more than 50 people, "including recent ongoing protests."  Martens Decl. Ex. 17.  On July 31, 2020, however, Mayor Bowser issued guidance for persons planning to attend the Commitment March, an August 28, 2020 mass gathering for racial justice.  Martens Decl. Ex. 40.  Mayor Bowser's guidance did not reference Defendants' Phase Two restrictions on mass gatherings or indicate that the Commitment March would be subject to these restrictions.  *Id.* On August 17, 2020, Mayor Bowser announced that the Commitment March had been "re-imagined" and that the March would take the form of "a seated event where the number of seats would be limited, people would be checked going into the seated area."  Martens Decl. Ex. 41.  On August 28, 2020, "[t]housands of protesters gathered" at the Lincoln Memorial to participate in

13

the Commitment March, *see* Martens Decl. Ex. 42, which lasted approximately five hours.[7] Defendants again closed dozens of city streets to vehicular traffic in order to accommodate the "First Amendment demonstrations." Martens Decl. Ex. 43.  On information and belief, Defendants appropriately recognized First Amendment rights and did not cite a single participant in the Commitment March for a violation of the Phase Two prohibition on mass gatherings.

In June 2020, Mayor Bowser was asked why she "celebrates massive street protests" while "churches and houses of worship remain shut."  *See* Martens Decl. Ex. 3.  She responded that "First Amendment protests and large gatherings are not the same" because "in the United States of America, people can protest."  *Id.*  In the United States of America, people can gather for worship under the First Amendment as well.

## D.    CHBC's Attempts to Meet in the District

On June 10, 2020, CHBC submitted a request to the District of Columbia for a waiver from Defendants' restrictions on large gatherings.  *See* Dunlop Decl. Ex. 5.  The request noted that, based on CHBC's "theological convictions," its "ability to meet together in person as a church is of the essence of what it means to be a church."  *Id.*  It also stated that, for all practical purposes, "if a church cannot meet in an assembly it does not exist."  *Id.*  It explained that "since the Mayor first requested that churches cease holding services, it has been [CHBC's] theological judgment not to hold any services—online or in person—nor have we been able to perform the Christian ordinances of baptism or communion."  *Id.*  This has been, the request concluded, "a substantial burden on" CHBC's congregation, "most of whom live in the District of Columbia."  *Id.*  The request asked for "a waiver so that [CHBC] can meet outside of a building in a manner consistent

---

[7] *See* Washington Post, *The 2020 March on Washington – 8/28 (FULL LIVE STREAM)*, https://www.youtube.com/watch?v=a9FwZJx7aq8.

with the current guidance applicable to outdoor restaurants." *Id.* In the request, CHBC pledged

to "ensure that each household is distanced by at least six feet" and "instruct all individuals above

the age of ten years to wear masks for the duration of the service." *Id.*

During the course of June, Jamie Dunlop, a pastor at CHBC, had multiple conversations

with Thomas Bowen in Mayor Bowser's Office of Religious Affairs. Dunlop Decl. ¶ 12.[8] After

several months passed and CHBC had not received a response on its waiver request (or any other

communication from the Mayor's Office), CHBC submitted an updated request on September 1,

2020. *See* Dunlop Decl. Ex. 6. The updated request noted that CHBC had been told that it could

use an outdoor space near RFK Stadium that "would very comfortably accommodate" its

congregation, but only if CHBC had a waiver from the District of Columbia government. *Id.* The

request again asked for "a waiver so that [CHBC] can meet outdoors in a manner consistent with

the current guidance applicable to outdoor service at restaurants." *Id.* CHBC pledged to "ensure

---

[8] Starting in June 2020, CHBC began meeting outdoors as one congregation on Sunday
evenings on a church property located outside the I-495 beltway in Virginia, because Virginia's
Governor began allowing churches to meet outdoors. Dunlop Decl. ¶ 14. Those in CHBC's
congregation who were able traveled to this location each week to meet outdoors, spaced at least
6 feet between households, with all participants over the age of ten years wearing masks. *Id.*
These outdoor services have resulted in no known cases of COVID-19 transmission despite
meeting for fifteen weeks. *Id.* Meeting as a congregation outside the I-495 beltway has been a
substantial burden on CHBC. *Id.* ¶ 15. Most of CHBC's congregation lives in the District of
Columbia, and many do not own vehicles. *Id.* Those who are unable to find safe transportation
to Virginia (which are many) have not been able to participate in Christian ordinances since early
March. *Id.*

Of course, the fact that CHBC is able to meet in Virginia is not a defense against any of its
claims against Defendants. The Supreme Court has been clear that "[o]ne is not to have the
exercise of his liberty of expression in appropriate places abridged on the plea that it may be
exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163 (1939); *see also Schad v.
Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (rejecting prohibition of expression in a
jurisdiction even though the exercise of such expressive rights was "amply available in close-by
areas outside the limits of the Borough").

that each household is distanced by at least six feet" and "instruct all individuals without medical exemptions above the age of two years to wear masks for the duration of the service." *Id.*

On September 2, 2020, Pastor Dunlop from CHBC contacted Nichole Opkins from Councilmember Charles Allen's office, informing her that CHBC had never received a reply to its June 10 waiver application and that CHBC had submitted an updated request the day before. Dunlop Decl. ¶ 18.  Ms. Opkins promised to reach out to the Mayor's Office for information.  *Id.* On September 15, 2020, the District of Columbia rejected CHBC's request for a waiver.  *See* Dunlop Decl. Ex. 7.  The denial letter thanked CHBC for providing information about its "social distancing plan, and other measures to mitigate the risk of spread of COVID-19."  *Id.*  Noting that the Phase Two Order's capacity limits for places of worship were "double the District's current prohibition on mass gatherings of more than fifty (50) persons," the letter stated that "[w]aivers *for places of worship* above that expanded capacity are not being granted at this time."  *Id.* (emphasis added).  To the extent CHBC's request was to operate above those gathering limits, the letter concluded, its request "is denied."  *Id.*

Meanwhile, on June 27, 2020, the District of Columbia granted a waiver request for a different type of expressive gathering protected by the First Amendment.  Earlier in June, two local companies had requested a waiver to operate a pop-up drive-in movie theater at RFK Stadium in a desire "to bring people together in D.C."  Martens Decl. Ex. 44.  The D.C. Homeland Security and Emergency Management Agency approved the waiver request, allowing the drive-in gathering to "hold up to 350 socially distanced vehicles."  *Id.*

The District of Columbia Department of Health has been tracking and reporting the incidence of COVID-19 infections in the District.  In the last seven days, 334 new cases of COVID-

19 have been reported in the District, with 43 new cases on September 21, 2020.[9]  Martens Decl. Ex. 45.  Despite the reduced presence of COVID-19 in its community, CHBC remains committed to emphasizing safety in its gatherings with social distancing precautions in order to ensure the safety and well-being of its congregants.  Dunlop Decl. ¶ 21.  Specifically, CHBC will consider health officials' recommended precautions in the conduct of its services.  *Id.*  These precautions will provide strong protection for the health of the church community and others by preventing contact and ensuring against the transmission of disease through the service.

### III.    Argument and Authorities

In determining whether to grant a temporary restraining order ("TRO"), courts must consider four factors: (1) whether the movant has a substantial likelihood of success on the merits, (2) whether the movant would suffer irreparable injury if a TRO were not granted, (3) whether granting the TRO would substantially injure other interested parties, and (4) whether the public interest would be furthered by granting the TRO.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  When a party seeks injunctive relief on the basis of the potential violation of the First Amendment, "the likelihood of success will 'often be the determinative factor.'"  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  For the reasons explained below, CHBC satisfies each of these requirements and is accordingly entitled to the requested relief.

---

[9] This is significantly diminished from positive test results at the height of the crisis.  For example, during the week of May 3, positive cases in the District of Columbia rose by 1,256.  *See* Martens Decl. Ex. 45.

A.    **CHBC is Likely to Succeed on the Merits of its Free Speech, Freedom of Assembly, RFRA, and Free Exercise Claims.**

CHBC has brought claims based on the freedom of speech, freedom of assembly, and the free exercise of religion guaranteed under the First Amendment as well as a claim under RFRA. As explained below, the Church is likely to succeed on each of those claims.

1.    *CHBC is Likely to Succeed on the Merits of its Free Speech Claim under the U.S. Constitution.*

Defendants' prohibition of mass gatherings has been selectively enforced against religious institutions and not mass protests, thus creating a content-based restriction on speech.  Defendant Bowser admitted as much, purporting to justify her preference of protests over worship services on her mistaken assertion that only the former are constitutionally protected.  The Mayor's content-based restriction on worship cannot pass constitutional scrutiny because it burdens substantially more speech than is necessary to further a legitimate government interest.  Indeed, when asked, the Mayor did not offer a governmental interest in support of her discrimination against religious speech.  *See* Martens Decl. Ex. 3.  Similarly, the District of Columbia, in rejecting CHBC's application for a waiver, responded that it was not considering waivers "for places of worship." *See* Dunlop Decl. Ex. 7.  The District did not claim that it is categorically denying waiver requests for all mass gatherings regardless of expressive purpose; that categorical denial applies only to places of worship.  Defendants have thus explicitly tied their enforcement of the Mayor's Order and their denial of CHBC's waiver application to the expressive content of the gathering, rather than the circumstances under which the gathering is conducted.  Content-based discrimination of this sort is unconstitutional, in violation of CHBC's First Amendment right to free speech.

The First Amendment of the Constitution prohibits governmental action "abridging the freedom of speech."  The Free Speech Clause applies "with equal vigor" to the District of

18

Columbia as to the federal government. *Espresso, Inc. v. Dist. of Columbia*, 884 F. Supp. 7, 9 (D.D.C. 1995).  Under that Clause, a government, including a municipal government, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  CHBC's religious worship gatherings are quintessential protected expression. *See, e.g.*, *Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (recognizing that forum restriction on an organization that taught Bible verses to children via stories, games, and prayer was a restriction on the freedom of speech).

"When a law or policy, though facially legitimate, is selectively enforced or subject to exceptions, it may suggest that content or viewpoint discrimination is afoot." *Pahls v. Thomas*, 718 F.3d 1210, 1238 (10th Cir. 2013) (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994)); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ("To create an exception for appellees' political speech and not [] other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.").  A content-based exemption from a ban is no less a content-based distinction because it is phrased as exempting certain speech from a ban rather than as imposing the restriction only on the burdened class of speech. *See City of Ladue*, 512 U.S. at 48-53; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993).  Thus, a plaintiff can sustain "a discrimination claim rooted in the First Amendment" if the plaintiff "show[s] that a governmental official 'acted with discriminatory purpose.'" *Pahls*, 718 F.3d at 1236 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Content-based distinctions of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

19

Here, Defendants have created a de facto content-based exemption from their ban on mass gatherings.  Both mass protests and religious services are subject to limitations on the number of attendees under Defendants' Phase Two restrictions.  But Defendants have selectively enforced those limitations, choosing to facilitate the safe gathering of some groups while declining an exemption to houses of worship from the Mayor's ban on mass gatherings.  *See Soos v. Cuomo*, __ F. Supp. 3d __, 2020 WL 3488742, at *11 (N.D.N.Y. June 26, 2020) ("Governor Cuomo's comments, which applauded and encouraged protesting and discouraged others from violating the outdoor limitations, likely demonstrate the creation of a de facto exemption.").  And the Mayor has acknowledged that her de facto exemption for mass gatherings for purposes of protests was without knowledge of any health implications.  As she stated, District officials did not "know what the impact of these demonstrations will be on our COVID experience in D.C."  Martens Decl. Ex. 34.

By acting as they have, Defendants have "sent a clear message that mass protests are deserving of preferential treatment."  *Soos*, 2020 WL 3488742. at *12; *see also Calvary Chapel Dayton Valley v. Sisolak*, 2020 WL 4251360, at *4 (July 24, 2020) (Alito, J., dissenting from denial of application for injunctive relief) ("[R]especting some First Amendment rights is not a shield for violating others.").  As seen in Mayor Bowser's interview on MSNBC, the discriminatory enforcement of her ban on large gatherings is based on her preference for social "protest" over religious worship, and she mistakenly asserts that the Constitution supports her content-based bias.  *See* Martens Decl. Ex. 3.  It does not.  "Public protests, of course, are themselves protected by the First Amendment."  *Calvary Chapel*, 2020 WL 4251360, at *4 (Alito, J.).  But favoring "certain speakers over others" is "anathema to the First Amendment."  *Id.*

Defendants' discriminatory content-based prohibition on outdoor church gatherings of more than 100 congregants is not "narrowly tailored" to the government's admittedly legitimate interest in promoting public health with regard to the COVID-19 pandemic, *see McCullen v. Coakley*, 573 U.S. 464, 486 (2014), as evidenced by Defendants' allowance of, and Mayor Bowser's personal participation in, outdoor gatherings of far greater size and little to no social distancing. Indeed, Mayor Bowser's office has coordinated with the organizers of other mass gatherings to assist them in exercising their First Amendment rights. CHBC is willing to follow social distancing and hygiene requirements and require attendees to wear masks. Yet Defendants' Phase Two restrictions forbid them from gathering as a church given that their church gatherings exceed 100 attendees. In other words, Defendants have shown they can accomplish their interest in more narrow ways than outright forbidding religious gatherings of 100 attendees or more. And, while many recent mass protests have not required social distancing and other hygiene requirements, CHBC is committed to following necessary precautions for the safety of its members and the community. Defendants' actions thus are not narrowly tailored as to CHBC's religious worship services and violate CHBC's constitutional right to free speech.

2.    *CHBC is Likely to Succeed on the Merits of its Freedom of Assembly Claim under the U.S. Constitution.*

Defendants' prohibition on CHBC's gathering as a church likewise significantly burdens CHBC's freedom of assembly. And again, the prohibition is not narrowly tailored to achieve the legitimate public health and safety interests of the government. Thus, the prohibition violates CHBC's First Amendment right to peaceably assemble.

The First Amendment of the U.S. Constitution protects the "right of the people peaceably to assemble." The Free Assembly Clause applies "with equal vigor" to the District of Columbia

as to the federal government.  *Espresso*, 884 F. Supp. at 9.  The right to peaceably assemble applies to any meeting, public discussion, or gathering, regardless of the subject of the gathering.  *See, e.g.*, *De Jonge v. Oregon*, 299 U.S. 353 (1937); *Herndon v. Lowry*, 301 U.S. 242 (1937).  The Supreme Court has long recognized that the First Amendment's freedom of assembly includes religious assemblies.  *See NAACP v. Alabama*, 357 U.S. 449, 460-62 (1958).  "Joining a lawful organization, like attending a church, is an associational activity that comes within the purview of the First Amendment …. 'Peaceably to assemble' as used in the First Amendment necessarily involves a coming together, whether regularly or spasmodically." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 562 (1963) (Douglas, J., concurring); *see also id.* (noting that while, historically, the right to assembly was considered part of the right to petition the government for a redress of grievances, the right to assembly has since become "equally fundamental" with the right to free speech and thus applies to "attending a church").  "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927).  When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available.  *See, e.g.*, *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

Here, Defendants' prohibition cannot withstand strict scrutiny because less restrictive alternatives of achieving the legitimate public safety interests are clearly possible: services could be held consistent with social distancing precautions that are designed to limit the spread of COVID-19, as Defendants allow with similar secular activities such as mass protests.  *See Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020) ("The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least

22

restrictive way of regulating the churches."). CHBC has committed to follow the same social distancing precautions followed by comparable non-religious assemblies. But despite the ability and willingness to take these precautions, Defendants' prohibition does not provide any exception for religious services, like CHBC's, where these guidelines would be carefully followed to satisfy the public health interests at issue. Defendants' endorsement of, facilitation of, and participation in mass protests with attendance far in excess of CHBC's membership, and without standardized social-distancing precautions, is the clearest example of their willingness to apply less-restrictive means to gatherings for the purpose of exercising First Amendment freedoms. By not allowing CHBC's in-person outdoor service, even when modified to comply with the relevant public health guidelines, Defendants have not narrowly tailored their action to the claimed interest, and thus violate CHBC's constitutional right to peaceably assemble.

      3.    *CHBC is Likely to Succeed on the Merits of its Claim under the Religious Freedom Restoration Act.*

Enacted in 1993, RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. A church such as CHBC is a "person" expressly protected by RFRA. 1 U.S.C. § 1; *Branch Ministries v. Rossotti*, 211 F.3d 137, 142 (D.C. Cir. 2000); *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 705 (2014). The District of Columbia, as an enclave of the federal government, is a covered governmental entity subject to RFRA. 42 U.S.C. § 2000bb-2(2). In order to make the required "demonstrat[ion]" to justify a

burden of religion, Defendants must satisfy both the evidentiary and persuasive burden.  42 U.S.C. §§ 2000bb-2(3).

RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000bb–2(4) (citing 42 U.S.C. § 2000cc–5).  In *Hobby Lobby*, the United States Supreme Court stated that the exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reason."  573 U.S. at 710 (citing *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)); *see also Lee v. Weisman*, 505 U.S. 577, 591 (1992) ("The Free Exercise Clause embraces a freedom of conscience and worship.").  A compelling interest sufficient to overcome free exercise rights includes "only those interests of the highest order."  *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).  And the least-restrictive-means standard is "exceptionally demanding."  *Hobby Lobby*, 573 U.S. at 728.  To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector.  *Id.*

By denying CHBC the ability to hold in-person outdoor church services for more than 100 people, Defendants are in violation of RFRA.  Defendants are substantially burdening CHBC's exercise of religion by attaching civil penalties to its in-person congregational gatherings.  *See Maryville*, 957 F.3d at 613 ("Orders prohibiting religious gatherings, enforced by police officers … amount to a significant burden on worship gatherings." (citing *Gonzales v. O Centro Espirita Beneficiente Uniao*, 546 U.S. 418, 428-32 (2006)); *Hobby Lobby*, 573 U.S. at 720, 726 (holding that a $2,000 per-employee penalty was a substantial burden).  Given this substantial burden, Defendants would have to prove—with admissible evidence, 42 U.S.C. § 2000bb-2(4)—that the governmental interest in protecting the public from COVD-19 cannot be sufficiently satisfied with

something less restrictive than an outright prohibition of outdoor worship gatherings larger than 100 people.  While it is not the Church's evidentiary burden, Mayor Bowser's own participation in and facilitation of outdoor events with attendance far in excess of CHBC's membership, and without standardized social-distancing precautions, disproves that less restrictive means are unavailable.  *See Maryville*, 957 F.3d at 613 ("The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches.").

Moreover, CHBC has committed to follow the same social distancing precautions followed by comparable non-religious establishments, including restaurants.  But despite the ability and willingness to take these precautions, Defendants' prohibition does not provide any exception for religious services, like CHBC's, where these guidelines would be carefully followed to satisfy the compelling public health interests at issue.  In fact, as Mayor Bowser has admitted, "[s]ome would say" that her limitations on churches are "more restrictive" than her limitations on retail establishments.  Martens Decl. Ex. 23.  Thus, Defendants fail the "exceptionally demanding" least-restrictive-means test and CHBC would be likely to succeed on its RFRA claim.

    4.    *CHBC is Likely to Succeed on the Merits of its Free Exercise Claim under the U.S. Constitution.*

Defendants' prohibition of in-person religious gatherings of more than 100 worshippers significantly burdens CHBC's exercise of religion.  The prohibition is neither generally applicable nor neutral, and it is not narrowly tailored to achieve the legitimate public health and safety interests of the government.  Thus, the prohibition violates CHBC's First Amendment right to free exercise of religion.

The First Amendment protects the "free exercise" of religion, and fundamental to this protection is the right to gather and worship.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts … [such as the] freedom of worship and assembly.").  The Free Exercise Clause applies "with equal vigor" to the District of Columbia as to the federal government.  *Espresso*, 884 F. Supp. at 9.  Because of this fundamental protection, a "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  The requirements to satisfy this scrutiny are so high that the government action will only survive this standard in rare cases, and the government bears the burden of meeting this exceptionally demanding standard.  *Id.*  Defendants' prohibition on CHBC's religious services and the threatened penalties for holding such services clearly impose a substantial burden on CHBC's religious exercise.  This action would thus need to pass strict scrutiny unless it is both generally applicable and neutral.  It is neither.

Government action is not generally applicable if its prohibitions substantially under-include non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect.  *Lukumi*, 508 U.S. at 542-46; *see also Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 663 (D.C. Cir. 1994) (holding that an HHS rule was generally applicable because it treated a religious organization "the same as it would treat a non-religious [organization].").  A law's under-inclusiveness "may raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or

viewpoint.'"  *Wagner v. FEC*, 793 F.3d 1, 27 (D.C. Cir. 2015) (quoting *Williams-Yulee v. Fla.*

*Bar*, 575 U.S. 433, 448 (2015)).

Even were Defendants' Orders here facially neutral and generally applicable—which they

are not[10]—the discriminatory manner in which they have been enforced would be subject to strict

scrutiny.  In *Lukumi*, the Supreme Court held that official action cannot be shielded from rigorous

First Amendment scrutiny "by mere compliance with the requirement of facial neutrality."  508

U.S. at 534.  Courts instead must look beyond a law's superficial neutrality and assess the actual

operation of the law.  *See id.* at 535 ("[T]he effect of a law in its real operation is strong evidence

of its object.").  Thus, for instance, in *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, the

Third Circuit held that although an ordinance was facially neutral, it was unconstitutional because

of its selective enforcement against the Orthodox Jewish community.  *See* 309 F.3d 144 (3d Cir.

2002); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359,

365 (3d Cir. 1999) (Alito, J.) ("[W]e conclude that the Department's decision to provide medical

exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent

so as to trigger heightened scrutiny.").  Here, Defendants have created a de facto exemption for

mass protests but not for worship services.  Because the "mass gatherings" prohibition has been

selectively enforced, it is not neutral.

Government actions that burden religious practice and are either not neutral or not

generally applicable must satisfy a compelling governmental interest and be narrowly tailored to

---

[10] Defendants' Orders are not facially neutral because they single out mass gatherings of
houses of worship by name.  *See Maryville*, 957 F.3d at 614 (noting that prohibiting "faith-based"
mass gatherings by name is a "hallmark[] of discrimination").  And Defendants' Orders are not
generally applicable because of their numerous exemptions.  *See id.* ("As a rule of thumb, the more
exceptions to a prohibition, the less likely it will count as a generally applicable, non-
discriminatory law.").

achieve that end.  *Lukumi*, 508 U.S. at 546.  Here, the government's prohibition is not "narrowly tailored" because Defendants themselves have demonstrated that there less restrictive means of achieving legitimate public safety interests.  Defendants permit similar secular gatherings at which thousands of people exercise their First Amendment freedoms of expression.  *See Maryville*, 957 F.3d at 613 ("The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches."); *Penkoski v. Bowser*, __ F. Supp. 3d __, 2020 WL 4923620, at *15 (D.D.C. Aug. 21, 2020) ("Plaintiffs' suggestion that the Mayor violated the Free Exercise Clause may indeed have merit, given that Plaintiffs allege that her COVID-19 restrictions have been selectively enforced—prohibiting churches from gathering in groups of more than ten people while tolerating protestors gathering by the thousands.").  CHBC has committed to following the same social distancing precautions followed by comparable non-religious establishments.  But despite the ability and willingness to take these precautions, Defendants' prohibition does not provide any exception for religious services, like CHBC's, where these guidelines would be carefully followed to satisfy the public health interests at issue.

By not allowing CHBC's outdoor in-person congregational gathering, even when modified to comply with social distancing precautions, Defendants have not narrowly tailored their action to the compelling interest, and thus violate CHBC's constitutional right to free exercise of its religion.

*     *     *

For the foregoing reasons, Defendants' actions violate the United States' constitutional guarantees of free speech, freedom of assembly, and free exercise of religion, as well as RFRA.

As a result, CHBC has established a substantial likelihood of success on the merits of the claims set out in its Original Complaint.

**B.     Enforcement of Defendants' Orders Will Inflict Irreparable Injury on CHBC if the TRO is Not Issued.**

The Supreme Court held in *Elrod v. Burns* that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976); *see also Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) ("[A]ny delay in the exercise of First Amendment rights constitutes an irreparable injury."). "By extension, the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012).

Defendants' Phase Two restrictions deny CHBC the right to practice its faith as its sincerely held beliefs compel. More specifically, without a temporary restraining order, CHBC will lose the right to celebrate the upcoming Lord's Day (and subsequent Lord's Days until the restrictions change) as one congregation in the District of Columbia, according to its sincerely held religious beliefs. This restriction on CHBC's religious practices constitutes immediate and irreparable harm to the Church. *See Maryville*, 957 F.3d at 616 ("[T]he prohibition on attending any worship service this Sunday, and the Sundays through May 20, assuredly inflicts irreparable harm.").

**C.     A TRO Would Not Substantially Injure Other Interested Parties.**

A temporary restraining order would not cause substantial harm to others, as Defendants have effectively conceded by their conduct in allowing and themselves participating in numerous large outdoor gatherings around the District of Columbia in recent months. Furthermore, the

participants in CHBC's outdoor worship gatherings are committed to physically gathering in a manner consistent with social distancing precautions to ensure the safety and well-being of members and congregants. This will provide strong protection for the health of the church community and others and err on the side of caution to prevent potential contact and mitigate risk of disease transmission. The gathering of CHBC's congregation thus will not create substantial harm to anyone. *See also Maryville*, 957 F.3d at 616 ("[A]n injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social-distancing rules in both settings.").

And, generally, the "substantially injure other interested parties" prong involves "a showing that the balance of hardships warrants an equitable remedy." *Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 74 (D.D.C. 2015). "[T]he fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in" favor of the party whose First Amendment rights are being violated. *Sammartano v. First Judicial Dist. Court in & for Cty. of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002) (internal quotation marks omitted); *see also Soos*, 2020 WL 3488742, at *12 ("The balance of hardships tips in plaintiffs' favor. Indeed, in the absence of an injunction, plaintiffs' religious activities will be burdened and continue to be treated less favorably than comparable secular activities. An injunction, on the other hand, does not undercut defendants' interest in controlling the spread of COVID-19, provided that plaintiffs abide by social distancing guidance."). Here, Defendants' actions threaten to bar CHBC's gathering as a church. The balance of hardships thus tips sharply in favor of CHBC.

**D.      The Public Interest in Protecting CHBC's Constitutional Rights Requires Entry of a TRO.**

Finally, the public interest is well-served by a temporary restraining order that prevents Defendants from unlawfully burdening the freedom of speech, the freedom of assembly, and the free exercise of religion.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted).  Likewise, "treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees."  *Maryville*, 957 F.3d at 616.

## IV.     Conclusion

For all the foregoing reasons, Plaintiff's motion for a temporary restraining order should be granted.

Dated: September 22, 2020                              Respectfully submitted,

                                                      */s/ Matthew T. Martens*
                                                      Matthew T. Martens (D.C. Bar No. 1019099)
                                                      Kevin Gallagher (D.C. Bar No. 1031415)*
                                                      Matthew E. Vigeant (D.C. Bar. No. 144722)*
                                                      Andrew Miller (D.C. Bar No. 1644997)*
                                                      WILMER CUTLER PICKERING HALE AND
                                                      DORR LLP
                                                      1875 Pennsylvania Avenue, NW
                                                      Washington, DC 20006
                                                      Tel: (202) 663-6000
                                                      Fax: (202) 663-6363
                                                      Matthew.Martens@wilmerhale.com
                                                      **admission application pending*

                                                      Kevin Palmer (*pro hac vice forthcoming*)
                                                      WILMER CUTLER PICKERING HALE AND
                                                      DORR LLP
                                                      60 State Street

Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
Kevin.Palmer@wilmerhale.com

Hiram S. Sasser, III (*pro hac vice forthcoming*)
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
Fax: (972) 941-4457
hsasser@firstliberty.org

*Attorneys for Capitol Hill Baptist Church*

## <u>CERTIFICATE OF COUNSEL PURSUANT TO FED. R. CIV. P. 65(b) AND LCvR 65.1</u>

On June 10, 2020, CHBC submitted an application to Defendants for a waiver from Defendants' restrictions on mass gatherings that would allow the Church to meet outdoors as a congregation in the District.  The waiver stated that attendees would wear masks during the duration of the service and the Church would ensure appropriate social distancing between households.  CHBC resubmitted the waiver request on September 1, 2020.  Defendants rejected CHBC's waiver request on September 15, 2020.

CHBC, simultaneous with this filing, gave notice of the time of making this application for a temporary restraining order and provided copies of all pleadings and papers filed in this action to date by emailing Mayor Bowser's Office and the District of Columbia Attorney General's Office copies of the relevant papers.

Further notice should not be required.

*/s/ Matthew T. Martens* _____
Matthew T. Martens