## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAPITOL HILL BAPTIST CHURCH,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | **Civil Action No. 1:20-cv-2710** |
| **MURIEL BOWSER**, in her official ) | |
| capacity as Mayor of the District of ) | |
| Columbia, and the **DISTRICT OF** ) | |
| **COLUMBIA**, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

## THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EXPEDITED PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest supporting Plaintiff's Motion for Temporary Restraining Order filed September 22, 2020, now a Motion for an Expedited Preliminary Injunction.  ECF No. 3-1.

This case involves important questions of how to balance the deference owed to public officials in addressing a pandemic threatening the health and safety of the public with fundamental rights of freedom of religion and expression.  While a local government has significant discretion to decide what measures to adopt to meet a public health threat, the Free Exercise Clause of the Constitution requires that, whatever level of restrictions it adopts, government must treat religious gatherings the same as comparable nonreligious gatherings, absent the government meeting strict scrutiny, that is, proving that it has a compelling governmental interest pursued through the least restrictive means.  Similarly, the Free Speech

Clause forbids the government from discriminating against certain speech while privileging other speech with a viewpoint favored by the government, unless it meets strict scrutiny.  And the Religious Freedom Restoration Act (RFRA), 42 U.S.C.§ 2000bb *et seq.*, which applies to all actions by the District of Columbia and its officers and agents, requires that any government action imposing a substantial burden on religious exercise meet strict scrutiny.[1]

Here, Defendants (collectively, the Honorable Muriel Bowser and the District of Columbia) are imposing a substantial burden, within the meaning of RFRA, on Plaintiff Capitol Hill Baptist Church's religious exercise by denying the church the ability to gather as a single body as required by its sincere religious faith.  This triggers strict scrutiny:  Defendants must meet the high burden of showing that their actions support a compelling governmental interest pursued through the least restrictive means.  Strict scrutiny also applies because Defendants also appear to be discriminating against the church by forbidding its proposed outdoor worship service for up to 1,000 persons while repeatedly allowing outdoor protests and gatherings of similar and often much larger size.  To be put simply, Defendants' current approach to COVID-19 limitations has the effect of treating some forms of protected First Amendment activity differently than other forms of comparable activity and in so doing singles out religious exercise for differential treatment.  Under the Free Speech Clause and the Free Exercise Clause, Defendants can only deny a permit to the church for its proposed outdoor religious worship in accordance with its sincerely held religious beliefs if they meet strict scrutiny.  Unless Defendants can carry this heavy burden, the church has demonstrated a likelihood of success on

---

[1] RFRA is a 1993 federal law enacted by Congress on a nearly unanimous basis and signed into law by President William J. Clinton.

the merits of its claim under the Free Exercise Clause and Free Speech Clause of the United

States Constitution's First Amendment, respectively, and under RFRA.

## INTEREST OF THE UNITED STATES

The Attorney General has statutory authority "to attend to the interests of the United

States in a suit pending in a court of the United States."  28 U.S.C. § 517.[2]

The United States has a substantial interest in the preservation of its citizens'

fundamental right to the free exercise of religion, expressly protected by the First Amendment.

To that end, the United States regularly files statements of interest and amicus briefs on

important issues of religious liberty in courts at every level, from trial courts to the Supreme

Court of the United States.  These issues also often involved free speech issues, and issues under

RFRA.  In addition, the Attorney General has issued comprehensive guidance interpreting

religious-liberty protections available under the United States Constitution and federal law.

---

[2] Section 517, in its entirety, provides: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.  Section 517 provides clear statutory authority for the United States, in its discretion, to attend to its interests in any court or proceeding to which it is not a party. *E.g.*, *Hunton & Williams v. United States DOJ*, 590 F.3d 272, 291 (4th Cir. 2010) ("A statement of interest, which is authorized by 28 U.S.C. § 517, is designed to explain to a court the interests of the United States in litigation between private parties.").  Section 517's text authorizes the United States to file statements without leave of court, contains no time limitation, and commits the discretion to file to the United States.  The United States has a long history of using this authority in private suits, filing over 600 statements of interest since 1925. Victor Zapana, Note, The Statement of Interest as a Tool in Federal Civil Rights Enforcement, 52 Harv. C.R.–C.L. L. Rev. 227, 228-29 (2017).  Section 517 entrusts the Attorney General, not courts, with the obligation to determine the contours of the United States' "interests."  *See, e.g.*, *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 833 n.6 (6th Cir. 2018) ("The legislative branch has created the scheme that gives the executive branch the ability to 'attend to the interests of the United States,' 28 U.S.C. § 517, as it—not we— may choose."); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 158 (D.D.C. 2002) (The United States "clearly has the authority pursuant to 28 U.S.C. § 517" to intercede in a case should it believe that its interests are sufficiently implicated).

*Federal Law Protections for Religious Liberty*, 82 Fed. Reg. 49,668 (Oct. 26, 2017) ("Attorney General Guidelines").

The United States also has a strong interest, especially in the midst of the COVID-19 pandemic, in ensuring the development and maintenance of the best possible public health strategies to combat the virus and protect the people of the United States from harm.  But that interest must be balanced with constitutional liberties.  This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting public health and safety from COVID-19 and citizens' fundamental right to the free exercise of religion.

### BACKGROUND[3]

Plaintiff Capitol Hill Baptist Church is a church with 853 members that has strong religious convictions that it must meet weekly, in person, as a single body for worship.  ECF Nos. 5 ¶6; 5-3.  The church has therefore long resisted holding multiple worship services on Sunday morning.  ECF Nos. 5 ¶6; 5-6.  With the onset of the COVID-19 pandemic in March 2020, Defendant Mayor Murial Bowser declared a public emergency and a public health emergency, and issued an order prohibiting gatherings of greater than 10 people.  ECF No. 4-7, 8.

The church's pastor made a decision not to move to online services as many other churches were doing, believing that this did not meet their religious mandate to assemble regularly as a body for worship.  ECF No. 4-4.  Instead, the church in June began to worship

---

[3] For purposes of this brief, the United States assumes the truth of the facts alleged in the exhibits accompanying the Plaintiff's Motion for Temporary Restraining Order (now a motion for an expedited preliminary injunction).

outside at a property in Virginia, outside the Capital Beltway, and also submitted requests to the District of Columbia for a waiver from the gathering restrictions to allow the church to hold worship outside with six-foot minimum distancing between families.  ECF No. 5 ¶14.  The majority of church members live in the District of Columbia, and many have been unable to travel to the Virginia property for worship.  ECF No. 5, ¶15.

On June 22, the Mayor issued an order raising the limit on gatherings for worship to 50% of capacity, with a cap of 100 people.  ECF No. 4-16, 7; ECF No. 4-22.  These limitations apply equally to indoor and outdoor services.  *Id.*  On September 2, 2020, the church received a letter from the District of Columbia denying its waiver request, and stating "[w]aivers for places of worship above [the 100-person] expanded capacity are not being granted at this time."  ECF No. 5-7.

While prior to June 22, 2020, gatherings were subject to a 10-person limit, whether indoor or outdoor, and beginning on that date were subject to a 50-person limit, the Defendants have permitted various gatherings that exceeded those limits.  Beginning in May, as people across the nation protested racial injustice, police misconduct, and related social justice issues, Defendants permitted numerous protests involving tens of thousands of participants.  ECF Nos. 4-29, 4-31, 4-32, 4-35, & 4-36.  Defendants closed streets to accommodate protesters, provided police escorts, and did not charge any protesters with violating COVID-19 gathering restrictions. ECF Nos. 4-29 to 4-34, 4-39.  Defendant Mayor Bowser attended the protests on June 6 and addressed the crowd.  ECF No. 4-29.  When asked to comment on the accusation that she "celebrates massive street protests" while "churches and houses of worship remain shut," the

Mayor responded that "First Amendment protests and large gatherings are not the same," stating that "in the United States of America, people can protest."  ECF No. 4-3.

On August 28, 2020 tens of thousands of protesters gathered at the Lincoln Memorial for a Commitment March and event commemorating the historic March on Washington led by Dr. Martin Luther King, Jr.—a 1963 March which profoundly and positively changed the course of American history.  ECF No. 4-41; 4-42.  The August 2020 event included seating for many participants.  *Id.*

Outdoor seating at restaurants in the District of Columbia is currently permitted, with the number of people gathering at these restaurants limited only by however many can be accommodated with six-foot distancing.  ECF No. 4-11, 6.  Indoor dining is also permitted at 50% capacity and six-foot distancing.  ECF No. 5-16, 5-6.

The church filed suit on September 22, alleging that Defendants' actions in preventing its outdoor worship and its indoor worship violate the Free Speech, Freedom of Assembly, and Free Exercise Clauses of the First Amendment to the Constitution, the Due Process Clause of the Fifth Amendment to the Constitution, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb.  ECF No. 1.  The same day, the church moved for a Temporary Restraining Order to permit it to hold an outdoor worship service.  ECF No. 3.  On September 25, the Court converted the TRO motion, without objection, to a Motion for Expedited Preliminary Injunction.

## ARGUMENT[4]

### I.       There Is No Pandemic Exception to the Constitution

The United States Constitution and its Bill of Rights protect us at all times.  These protections are especially important during times of crisis such as the current COVID-19 pandemic, when the federal government, the District of Columbia, and all fifty States have declared states of emergency and have taken unprecedented and essential steps to contain the spread of the novel coronavirus and the consequences of the life-threatening COVID-19 pandemic.[5]

The Constitution generally provides for substantial deference to necessary, temporary measures taken by the government to meet a genuine health emergency.  According to the Supreme Court's seminal decision in the area of government restrictions during a public health emergency, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."  *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905).

That deference is not absolute, however.  Courts have a duty to intervene "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Jacobson*, 197 U.S. at 31.  In that

---

[4] The United States only expresses a position on the issues herein (*i.e.*, the RFRA and the Free Speech and Free Exercise Clauses of the U.S. Constitution's First Amendment).

[5] *See, e.g.*, Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020).

analysis, the key inquiry is often whether the government is treating like behavior alike.  The government cannot subject protected activity to restrictions that are "more severe" than the "restrictions [that] apply to comparable" non-protected activity, or draw artificial distinctions within such protected activity.  *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of injunctive relief).

And, as Justice Alito recently noted, the calculus likely changes even further when the government's actions during an emergency not only implicate fundamental constitutional rights but are *also* widespread and long-lasting.  *See, e.g.*, *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (Alito, J., dissenting from denial of injunctive relief) ("[I]t is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox.  It is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case.").  "At the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify— public officials may not be able to craft precisely tailored rules," and so "at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules," but "a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists."  *Id.* at  2605.  In such cases, the government's actions should generally satisfy the same legal tests used outside of public health emergencies—*e.g.*, restrictions on First Amendment activities must "withstand strict scrutiny" just as in any other case involving First Amendment restrictions, *id.* at 2608—although the government's competing interests admittedly may be greater than during a non-emergency.

Although the precise legal tests may change based on the specific restriction at issue, the bottom line remains the same: there is no pandemic exception to the Constitution and our fundamental rights.  Individual rights set forth in the Constitution are always operative and restrain government action.

**II.      Defendants' Actions Trigger Strict Scrutiny under Congress's Religious Freedom Restoration Act and under the Constitution's First Amendment**

The Religious Freedom Restoration Act (RFRA), 42 U.S.C.§ 2000bb *et seq.* and the Free Speech and Free Exercise Clauses of the First Amendment to the U.S. Constitution, independently, require that Defendants show that their denial of approval for the church to hold its proposed worship service is supported by a compelling governmental interest pursued through the least restrictive means.

**A.  The Religious Freedom Restoration Act (RFRA)**

"Under RFRA, the Federal Government may not 'substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,' unless it 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2389 (2020) (quoting statute).  The District of Columbia, as an entity created by the federal government, is subject to and bound by RFRA.  *Potter v. District of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

In evaluating whether a burden on religious exercise is "substantial," because "Congress incorporated into RFRA a term of art—substantial burden—previously used in numerous Supreme Court cases in applying the Free Exercise Clause," *Navajo Nation v. U.S. Forest Serv.*,

535 F.3d 1058, 1074 (9th Cir. 2008), courts look to Free Exercise jurisprudence from prior to *Emp't Div. v. Smith*, 494 U.S. 872 (1990), in determining the meaning of substantial burden. *Id.* *See also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014).

Accordingly, the D.C. Circuit has held that a "a substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 718 (1981)). Or, as the Supreme Court described the substantial burden inquiry in *Sherbert v. Verner*, 374 U.S. 398 (1963), a substantial burden will exist where someone is compelled to violate his belief, where government action has the effect of "imped[ing] the observance" of religion "even though the burden may be characterized as being only indirect," or where the government action imposes "pressure . . . to forgo [a religious] practice." *Id.* at 403-404.

The Supreme Court's recent RFRA decisions make clear that courts applying RFRA must be deferential to a claimant's articulation of how a government action would burden its religious beliefs. In *Little Sisters*, the Court examined whether compliance with a government directive would "cause the objecting party to violate its religious beliefs, *as it sincerely understands them.*" *Id.* at 2389 (emphasis in original). *See also Hobby Lobby*, 537 U.S. at 725 ("[I]t is not for us to say that [claimants'] religious beliefs are mistaken or insubstantial. Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction.") (citation and internal quotation marks omitted).

Here, the church adequately asserts a sincere religious belief that its congregation must meet together for worship weekly as a single body. As noted, Capitol Hill Baptist Church is a

church with 853 members that has strong religious convictions that it must meet weekly, in person, as a single body for worship.  ECF Nos. 5 ¶6; 5-3.  Unlike many houses of worship, Capitol Hill Baptist Church has long resisted holding multiple worship services on Sunday morning.  ECF Nos. 5 ¶6; 5-6.  The 100-person limit on outdoor gatherings thus allows only a fraction of the church's members to worship.  Defendant's COVID-19 gathering limit thus puts "substantial pressure on [the church] to modify [its] behavior and to violate [its] beliefs." *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas*, 450 U.S. at 718).  It also has the effect of "imped[ing] the observance" of the church's faith as it understands it.  *Sherbert*, 374 U.S. at 404. The alternative available to the church, meeting in Virginia outside the beltway, leaves out a significant portion of its congregation and thus does not satisfy its religious obligation.  *See Hobby Lobby*, 537 U.S. at 725 ("[O]ur narrow function . . .  is to determine whether the line drawn reflects an honest conviction.") (citation and internal quotation marks omitted); *see also Western Presbyterian Church v. Bd. of Zoning Adj.*, 849 F. Supp. 77, 79 (D.D.C. 1994) (holding that RFRA barred denying congregation permit to run homeless feeding program at its church despite fact that it could obtain permit to operate a program elsewhere in the city).  This is plainly a substantial burden on the religious exercise of the church; indeed for those congregants unable to attend, it represents a complete denial of their ability to participate in worship as their faith requires.

Because the church has adequately alleged that the Defendants' actions have imposed a substantial burden on its religious exercise, the burden shifts to the Defendants meet the "high bar" of showing that they have a compelling governmental interest, pursued through the least restrictive means.  *Little Sisters*, 140 S. Ct. at 2392.

**B**.      **Free Speech Clause of the First Amendment**

One of the most basic protections of the Free Speech Clause is that the government may not as a general matter privilege certain speech which it favors and restrict other speech that it does not. *See, e.g.*, *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (invalidating exclusion of church's religious speech from forum and explaining that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *United States v. Armstrong*, 517 U.S. 456, 463-468 (1996) (addressed selective enforcement); *see also Widmar v. Vincent*, 454 U.S. 264, 269 n.6 (1981) (holding that exclusion of religious worship from speech forum was impermissible discrimination, and rejecting argument that "religious worship" is "not speech protected by" the First Amendment, but instead is an "act" undeserving of First Amendment protection).

Accordingly, the court must consider whether Defendants' COVID-19 limitations are being enforced in a viewpoint-neutral way. Our country's response to recent events has shown the importance of peaceful protests to maintaining our civil fabric. Across the country, hundreds and, in many cases, thousands of people have gathered to express their views on a wide range of topics including social justice matters of national significance. But even speech the government deems as important and socially beneficial—indeed especially such speech—cannot under the First Amendment be used as a basis for allowing certain speakers and barring others. The church seeks to hold an expressive event consisting of an outdoor worship service with appropriate distancing and other precautionary measures, indeed one significantly smaller in size than the protests and March on Washington commemoration event in August 2020 that the Defendants allowed and considerably smaller than the crowds at recent protests.

If viewpoint discrimination is found on the record in this case, then that action must meet the demanding standard of being justified by compelling interest pursued through the least restrictive means.

**C**.     **Free Exercise Clause of the First Amendment.**

The Free Exercise Clause guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990).  It also protects their right to act on these beliefs, through gathering for public worship as in this case, or through other acts of religious exercise in their daily lives.  While the protections for actions based on one's religion are not absolute, *id.* at 878-79, among the most basic requirements of the Free Exercise Clause are that government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (citation and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49,672.

To determine whether a law impermissibly targets religious believers or their practices, the Supreme Court has directed courts to "survey meticulously" the text and operation of a challenged law to ensure that it is neutral and of general applicability.  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993).  The Court explained:  "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights

guaranteed by the Free Exercise Clause." *Id.* at 543; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

Under the Free Exercise Clause, a law or rule, or the application of a law or rule, that is not both neutral and generally applicable is subject to heightened scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.[6] A law or rule is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; "visits gratuitous restrictions on religious conduct"; or "accomplishes . . . a religious gerrymander, an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533-35, 538 (citations and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than does" the prohibited conduct. *Church of the Lukumi Babalu Aye*, 508 U.S. at 534; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. Thus, for example, in *Church of the Lukumi Babalu Aye*, the Supreme Court found that challenged ordinances were not generally applicable when they were "underinclusive with regard to the [government's] interest in public health" by outlawing religious conduct but failing to prohibit various nonreligious conduct that had an equal or greater impact on public health. 508 U.S. at 543-45.

---

[6] A plaintiff who demonstrates that a law is not neutral or not generally applicable need not show a substantial burden. The differential treatments is sufficient to trigger strict scrutiny. See *Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 138 (D.D.C. 2004).

Chief Justice Roberts' recent statement respecting the denial of a stay in *South Bay United Pentecostal*, further emphasizes the importance of the question whether religious gatherings are treated equally with "comparable secular gatherings" for purposes of applying the Free Exercise Clause to orders relating to COVID-19.  140 S. Ct. at 1613 (Roberts, C.J., concurring); *id*. at 1614-15 (Kavanaugh, J., joined by Thomas and Gorsuch, J.J.) (emphasizing similarly the importance of equal treatment, but disagreeing with the Chief Justice as to the answer to the question in that case).  Chief Justice Roberts noted that the order at issue there "exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods."  *South Bay United Pentecostal*, *id.* at 1613 (Roberts, C.J., concurring).

The Sixth Circuit reasoned similarly in two recent cases.  In *Roberts v. Neace*, 958 F.3d 409, 413, 415 (6th Cir. 2020) (per curiam), the court concluded that "the four pages of exceptions" in the COVID-19 orders at issue "and the kinds of group activities allowed, remove[d] them from the safe harbor for generally applicable laws."  Likewise, in *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020), the court determined that "many of the serial exemptions for secular activities pose comparable public health risks to worship services," rendering COVID-19 closure orders not generally applicable.

As explained by Chief Justice Roberts in his concurrence in *South Bay United Pentecostal Church*, and the Sixth Circuit in *Roberts* and *Beshear*, this Court should determine whether the District of Columbia regulatory scheme "exempt[ ] or treats more leniently only dissimilar activities," or if outdoor protests and outdoor restaurants are similar to outdoor

worship services insofar as they involve "people . . . congregat[ing] in large groups [ ]or remain[ing] in close proximity for extended periods." *South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  In other words, the Court must ensure that like things are treated as like, and that religious gatherings do not receive unequal treatment.

The Defendants have enacted restrictions on gatherings, including outdoor religious gatherings such as the church's proposed worship services.  Defendants have taken a decidedly different approach toward mass gatherings involving at least certain protest activities within the District of Columbia.  As discussed above in Section II B above, the United States does not question the wisdom of Defendants' decision to allow peaceful protests and events such as the recent commemoration of the March on Washington or other peaceful protects related to legitimate social justice causes.  But Defendants cannot subject protected religious activity to restrictions that are "more severe" than the "restrictions [that] apply to comparable" non-protected activity, or draw artificial distinctions within such protected activity.  *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of injunctive relief).  Accordingly, under the Free Exercise Clause the church has raised substantial questions about whether this is neutral or generally applicable regulation in response to COVID-19.

An outdoor religious worship service such as that proposed by the church has not been shown to be any more of a potential hindrance to Defendants' efforts to reduce COVID-19 transmission than the mass protest activity it has allowed.  Indeed, if anything, an outdoor worship service has elements that provide superior ability to maintain distancing and reduce transmission.  The church has committed to requiring all participants over the age of two years to

wear masks for the entire service, except if they have medical exemptions, and enforce six-foot distancing between families.  ECF No, 5-6.  Leaders holding a worship service for their regular congregation would have more ability to enforce distancing and masking requirements than leaders of a fluid protest.  Similarly, a congregation at an outdoor worship service can adhere to mask standards much more easily than restaurant patrons, who must remove masks to eat or drink.  *Id.*  Defendants thus appear to "exempt[] or treat[] more leniently" precisely the types of activities that Chief Justice Roberts suggested would be appropriate comparators for religious gatherings—specifically, activities that involve people "congregat[ing] in large groups [ ]or remain[ing] in close proximity for extended periods."  *South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring); *see also Fraternal Order of Police v. Newark*, 170 F.3d 359 (3d Cir. 1999) (Alito, J.) (holding that exempting from groom regulation police officers wearing beards for medical reasons, but not those wearing them for religious reasons, rendered rule not generally applicable); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.) (law not generally applicable where it  "burdened a category of religiously motivated conduct but exempted . . . a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated.").  Moreover, the protests in the District of Columbia have involved outdoor gatherings many times larger than the worship service the church proposes, and lasting much longer than a church service.  Thus, the fact that Defendants' rules treat unequally religious conduct that appears to endanger their interest to no greater degree than the permitted secular activities shows, on this record and at this stage of the litigation, that they appear not to

have acted in a generally applicable manner, which would trigger struct scrutiny under the Free Exercise Clause.

Strict scrutiny may also apply for a second reason:  the rules do not appear to be neutral toward religion.  Defendants appear to have made a value judgment that the social benefit of allowing protests outweighs the increased risk of COVID-19 transmission (and correspondingly the lack of social benefit to permitting outdoor religious worship of the kind proposed by Capitol Baptist Church).  In *Fraternal Order of Police v. Newark*, 170 F.3d at 365, the Third Circuit held that a police department exempting from its grooming requirements officers who wore beard for medical reasons had to, under the Free Exercise Clause, meet strict scrutiny in order to deny a similar exemption to those seeking to wear beard for religious reasons.  The Court observed that "in *Smith* and *Lukumi*, it is clear . . . that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations." *Id.*  The court thus held that strict scrutiny attaches when government "makes a value judgment in favor of secular motivations, but not religious motivations."  The same is true with the exemptions here for protests: they represent a value judgment in favor of secular gatherings to protest, but not for religiously motivated gatherings to worship.

Thus to the extent that Defendants' orders are not neutral or because it is not generally applicable, the Defendants' COVID-19 gathering restrictions must advance "interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546.

**III.       The Compelling Interest/Least Restrictive Means Test is a Searching Inquiry**

To satisfy the commands of the Free Exercise Clause, a law restrictive of religious practice must advance "interests of the highest order" and must be "narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546. "The compelling interest standard that we apply . . . is not watered . . . down but really means what it says." *Id.* The same standard applies under the Free Speech Clause, see *Reed v. Town of Gilbert*, 576 U.S. at 164, and under RFRA, see *Little Sisters*, 140 S. Ct. at 2392-94 (where substantial burden is established, government must clear "high bar" of showing a "compelling interest" pursued through "least restrictive means"). On this record, it does not appear that Defendants can meet this demanding standard.

Prohibiting large gatherings to slow the spread of COVID-19 undeniably may advance a compelling government interest, but the question here is whether denying the church's outdoor worship gatherings advance such an interest in light of the comparable gatherings that Defendants have decided their efforts to slow the spread of COVID-19 can tolerate. As the Supreme Court explained in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. And given that "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited," the existence of exemptions for similar conduct is relevant in determining whether denying the desired religious exemption survives strict scrutiny. *Little Sisters*, 140 S. Ct. at 2392 (citation and internal quotation marks omitted); *see also O*

*Centro Espirita*, 546 U.S. at 436.  Thus the Court in *Little Sisters* held that where the government asserts a compelling interest, "we must take into account exceptions to this asserted rule of general applicability."  140 S. Ct. at 2392 (citation and internal quotation marks omitted).  *See also O Centro Espirita*, 546 U.S at 432-34.  The Court in *Little Sisters* found there were "exceptions aplenty" that undermined the government's claim of compelling interest.  140 S. Ct. at 2392; *see also, e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 864-67 (2015) (recognizing the deference due prison officials but holding that other exemptions showed that the prison did not satisfy strict scrutiny).  The Court has held that the same principle applies in evaluating compelling interest in the Free Speech context.  *See Reed*, 576 U.S. at 2232 ("a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citation and internal quotation marks omitted).

Additionally, under RFRA the government must show a compelling interest with regard to applying the law "'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *O Centro Espirita*, 546 U.S. at 431.  The focus must be on the government's interest in restricting the actions of the individual claimant in the particular manner the claimant proposes.  See *id.* at 430-32.

Defendants thus must show that their interest in restricting Plaintiff's proposed outdoor gathering for worship with social distancing, masking, and other protective measures, while allowing even larger gatherings for protests with less distancing and fewer protective measures— furthers a compelling interest.  As in *Little Sisters*, there are "exceptions aplenty," 140 S. Ct. at 2392, and this requires the state to show why it has a compelling interest in denying such an

exception to the Plaintiffs.  The same is true for imposing a 100-person limit on outdoor worship while allowing outdoor restaurants without a numerical cap so long as social distancing between parties is maintained.  In light of its various exceptions, the State must show that there are "relevant differences," *O Centro Espirita*, 546 U.S. at 431-32, with regard to efficacy in slowing the spread of COVID-19, between allowing the church to meet as proposed and allowing other preferentially treated secular gatherings, such as at restaurants and protests.  The face of the Defendants' orders and related documents identify no such differences, and unless they can show something more, they must grant similar treatment to the church.

In addition, the Defendants must meet their burden of establishing that their approach is the least restrictive means of furthering any asserted compelling interest.  This is an "exceptionally demanding" standard, *Hobby Lobby*, 573 U.S. at 728, requiring the government to show "it lacks other means of achieving its desired goal."  *Id.  See also Little Sisters*, 140 S. Ct. at 2394 ("If a less restrictive means is available for the Government to achieve its goals, the Government must use it.") (citation and internal quotation marks omitted).  To do so, they must refute the "'alternative schemes' suggested by the plaintiff to achieve that same interest and show[ing] why they are inadequate."  *Yellowbear v. Lampert*, 741 F.3d 48, 62-63 (10th Cir. 2014) (Gorsuch, J.).  Here, the church has made representations that it will follow a strict regimen of social distancing, masking, and hygiene protocols if allowed to gather.  Defendants are obligated to explain persuasively why this regimen would be insufficient.

Indeed, in assessing Kentucky's ban on in-person religious services in relation to COVID-19, the Sixth Circuit proposed precisely what Plaintiff seeks to do as a less restrictive means of achieving the public health interests implicated by that disease.  The court in *Roberts*,

958 F.3d at 415, asked: "Why not insist that the congregants adhere to social distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities?"

## CONCLUSION

The United States respectfully requests that the Court consider these arguments in deciding Plaintiff's' Motion for an Expedited Preliminary Injunction.  The facts, on this record, show that the Defendants imposed a substantial burden on the church's religious exercise under RFRA, have imposed restrictions on religious gatherings that they have not imposed on comparable secular activities under the Free Exercise Clause, and are enforcing their COVID-19 limitations on outdoor gatherings in a manner that raises viewpoint discrimination concerns. Accordingly, these actions are unlawful unless Defendants can demonstrate that its actions satisfy the demanding strict scrutiny standard.  If they cannot meet this standard—and the current record suggests the cannot—the United States respectfully requests that the Court grant Plaintiff's requested Motion for an Expedited Preliminary Injunction.

DATED: October 2, 2020

Respectfully Submitted,

ERIC S. DREIBAND
Assistant Attorney General

MICHAEL R. SHERMAN
United States Attorney
District of Columbia

ALEXANDER V. MAUGERI
Deputy Assistant Attorney General

/s/ Kenneth C. Kohl
KENNETH C. KOHL
Acting Principal AUSA
U.S. Attorney's Office
555 4th Street, NW
Washington D.C. 20001
DC Bar No. 476236
202.252.7793
Ken.Kohl@USDOJ.gov

ERIC W. TREENE
Special Counsel
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave, NW
Washington, DC 20530

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF users associated with this case.

/s/ Kenneth C. Kohl
*Attorney for the United States of America*