**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CAPITOL HILL BAPTIST CHURCH**,

               Plaintiff,

               v.

**MURIEL BOWSER**,
*In her official capacity as Mayor of the*
*District of Columbia*,

**DISTRICT OF COLUMBIA**,

               Defendants.

Case No. 20-cv-02710 (TNM)

---

## MEMORANDUM OPINION

Capitol Hill Baptist Church ("the Church") has opened its doors for a weekly worship service for 142 years—until now. Its doors closed in March, on Mayor Muriel Bowser's COVID-19-related orders. At first, the Church accepted these restrictions willingly. But as the months passed by and the Mayor lifted other restrictions and welcomed mass protests to the city, the Church sought permission to hold its weekly service outdoors, with congregants masked and socially distanced. The District denied permission because the Church's doctrinal requirement of a weekly gathering of its entire congregation together conflicts with the Mayor's prohibition on religious gatherings of more than 100 people, indoors or out.

The Church sues the Mayor and the District of Columbia (collectively, the "District"), arguing that their actions violate, among other laws, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. Before the Court is the Church's motion for an expedited preliminary injunction. It seeks to enjoin the District from enforcing its restrictions insofar as they prevent the Church from holding socially-distanced outdoor worship services in which

congregants wear masks.

The Court determines that the Church is likely to succeed in proving that the District's actions violate RFRA.  The District's current restrictions substantially burden the Church's exercise of religion.  More, the District has failed to offer evidence at this stage showing that it has a compelling interest in preventing the Church from meeting outdoors with appropriate precautions, or that this prohibition is the least-restrictive means to achieve its interest.  The Court will therefore grant the Church's motion for injunctive relief.

## I.

The Church first met on Capitol Hill in 1878.  Mem. in Supp. of Pl.'s Mot. For Prelim. Inj. ("Pl.'s Mot.") at 7, ECF No. 3-1.[1]  And except for a three-week hiatus during the peak of the Spanish flu in 1918, its members have continued to gather weekly, in person, ever since.  *Id*. Although the Church started with 31 members, *id*., today it has 853—most of whom live in the city, Decl. of Jaime Dunlop ("Dunlop Decl.") at 1–2, ECF No. 5.  Prior to the onset of COVID-19, around 1,000 people attended the Church's Sunday services.  *Id.* at 1.  Unlike many other religious entities, the Church "does not offer virtual worship services, it does not utilize a multi-site model, and it does not offer multiple Sunday morning worship services."  *Id*. at 2.  To the Church, "a weekly in-person worship gathering of the entire congregation is a religious conviction for which there is no substitute."  Pl.'s Mot. at 7.

The Church, like similar entities, has not escaped the effects of the COVID-19 pandemic. It halted its regular services in March 2020, when Mayor Bowser declared a public-health emergency.  Dunlop Decl. at 2; Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. ("Defs.' Opp.") at 15, ECF No. 15.  The District, like state and local governments around the country, has imposed

---

[1]  All citations are to the page numbers generated by this Court's CM/ECF system.

restrictions in response to COVID-19.  Shortly after declaring a state of emergency, *see* Decl. of

Matthew T. Martens ("Martens Decl.") Ex. 5 ("Mayor's Order 2020-045"), ECF No. 4-5;

Martens Decl. Ex. 6, ECF No. 4-6 ("Mayor's Order 2020-046"), the District prohibited "large

gatherings"—defined to include events with ten or more persons in an indoor or outdoor space,

Martens Decl. Ex. 7 ("Mayor's Order 2020-053") at 4, 8, ECF No. 4-7; Defs.' Opp. at 17.

On May 27, the District began Phase One of a four-phase reopening plan, in which

gatherings of more than ten people were prohibited.  Martens Decl. Ex. 11 ("Mayor's Order

2020-067") at 3–4, ECF No. 4-11; Defs' Opp. at 18.  Phase Two began on June 22 and remains

in effect.  Martens Decl. Ex. 16 ("Mayor's Order 2020-075") at 3, ECF No. 4-16; Pl.'s Mot. at

15; Defs.' Opp. at 19.[2]  In this phase, restaurants may have up to 50 percent capacity indoors, but

have no limit on the number of patrons that they may seat outdoors.  Mayor's Order 2020-075 at

5–6.  The restrictions on gatherings loosened, permitting gatherings of up to 50 people.  *Id.* at 3.

"Places of worship are encouraged to continue providing virtual services"; if they meet in

person, they may "operate with expanded capacity limits"— the fewer of 50 percent capacity or

100 persons.  *Id.* at 7; Martens Decl. Ex. 22 ("Phase Two Guidance for Places of Worship") at 2,

ECF No. 4-22.  These limits are the same whether the gathering takes place indoors or outside.

Phase Two Guidance for Places of Worship at 2.

Those who "knowingly violate[]" the District's restrictions "may be subject to civil and

administrative penalties authorized by law, including sanctions or penalties for violating D.C.

Code § 7-2307, including civil fines or summary suspension or revocation of licenses."  Mayor's

---

[2]  The District informed the Court that the Mayor issued a new order on October 7, 2020, which
extended the public emergency and public-health emergency through December 31, 2020, and
made some changes to Phase Two restrictions.  Defs.' Notice of Suppl. Authority at 2–4, ECF
No. 36-1.  The order does not appear to otherwise affect the prohibitions that the Church
challenges or the associated penalties.  *Id.* at 4.

Order 2020-075 at 12; *see also* D.C. Code § 7-2307 (allowing the Mayor to, among other things, "provide for a fine of not more than $1,000 for each violation" of emergency executive orders). It is unclear when the District plans to move to Phase Three—which would, according to the ReOpen DC Advisory Group's recommendation, limit houses of worship to 250 congregants, Martens Decl. Ex. 28 at 2, 20, ECF No. 4-28.  Limits on the number of congregants would cease in Phase Four, which will be triggered by a vaccine or other widely-administrable cure.  *Id.* at 20, 25.

Amid COVID-19's arrival and the District's associated restrictions, a wave of protests swept the country beginning in late spring, and Washington, D.C. saw gatherings by the thousands.  Pl.'s Mot. at 17–20.  The Church argues that the District has treated mass protests more favorably than religious services by not enforcing its capacity restrictions on gatherings against protestors.  *Id.* at 20.  Specifically, it contends that the District has supported these large gatherings as evidenced by, among other things, Mayor Bowser's attendance at a protest on June 6, 2020.  *See, e.g.*, *id*. at 17–20.[3]  The District disputes its control over mass protests on federal land; it also maintains that religious services pose a greater risk of infection than protests, and that no spike in COVID-19 cases or deaths resulted from these large gatherings.  Hr'g Tr. at 43–44.

Around the same time as some of these protests, the Church petitioned the District for a waiver so that it could resume meeting as an entire congregation.  Dunlop Decl. Ex. 5 ("June Request") at 2, ECF No. 5-5.  While some D.C. congregations have voluntarily cancelled their

---

[3] *See also* Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply Br.") at 11 & n.7; WUSA9, *DC Mayor Bowser attends Justice For George Floyd protest at Black Lives Matter Plaza*, YouTube.com (June 6, 2020), https://www.youtube.com/watch?v=-ZVyhydp1lU&feature=youtu.be.

services or moved to virtual platforms, *see, e.g.*, Defs.' Opp. at 20–21, the Church explained that, "[b]ased on [its] theological convictions, [its] ability to meet together in person as a church is of the essence of what it means to be a church," and that "if a church cannot meet in an assembly it does not exist," June Request at 2.  The Church requested that the District allow it "to meet outdoors in a responsible, socially distanced manner"—meaning that it would provide for six-foot distancing between households and require attendees to wear masks.  *Id.* at 2–3.

When it did not receive an answer from the District, the Church re-applied for a waiver on September 1.  Dunlop Decl. Ex. 6 ("September Request"), ECF No. 5-6.  It informed the District that it had begun holding services weekly in Virginia, where outdoor services were permitted, but explained that "this has been a substantial burden on our congregation, most of whom live in the District of Columbia" and "many of whom do not own vehicles." *Id.* at 2.  The Church renewed its request to meet outdoors with similar precautions in place.

The District denied the Church's waiver request on September 15.  Dunlop Decl. Ex. 7, ECF No. 5-7.  The denial reiterated that current restrictions limited the Church to the fewer of 50 percent capacity or 100 persons—whether indoor or outdoor—and that "[w]aivers for places of worship above that expanded capacity are not being granted at this time." *Id.* at 2.  Shortly after that denial, the Church sued the District.

Along with its complaint, the Church filed a motion for a temporary restraining order, Pl.'s Mot. for TRO, ECF No. 3, which the Court converted without objection into a motion for an expedited preliminary injunction, Min. Order (Sept. 24, 2020).  The Church seeks relief from the District's enforcement of its restrictions, which, as they currently stand, prevent it from physically gathering as one congregation.  Pl.'s Compl. at 25, ECF No. 1.  The Church contends that it is entitled to relief because it is likely to prove that the District's actions violate RFRA and

its constitutional rights, and that it will suffer irreparable harm in the meantime.  Pl.'s Mot. at 34–35.  It requested an evidentiary hearing and asked to call Mayor Bowser as a witness.  Hr'g Tr. at 2–3.  The Court denied this request.  *See* LCvR 65.1(d) ("The practice in this jurisdiction is to decide preliminary injunction motions without live testimony where possible.").  The District opposed the Church's request that Mayor Bowser testify and did not otherwise seek an evidentiary hearing.  Hr'g Tr. at 2–3.

The Church's motion for injunctive relief is now ripe.[4]  The Court heard oral arguments from each side and has reviewed the statement of interest submitted by the United States, as well the briefs submitted by amici curiae.

## II.

A preliminary injunction is "an extraordinary remedy never awarded as of right," but as an exercise of discretion by a court sitting in equity.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  This remedy should be granted only if the party moving for a preliminary injunction makes a showing that four factors, taken together, warrant relief:  (1) the party is likely to succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction serves the public interest.  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).[5]

---

[4]  This Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

[5]  How courts should weigh these factors against one another "remains an open question" in this Circuit.  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *see Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (tracing Circuit case law).  Because the Court finds that the Church prevails on each factor, it need not wade into this debate today.

The "primary purpose" of a preliminary injunction is "to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). So when the "requested injunction is mandatory—that is, its terms would alter, rather than preserve, the status quo by commanding some positive act" by the defendant—the movant must meet a higher burden. *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020). *But see League of Women Voters*, 838 F.3d at 7 (questioning distinction between "mandatory" and "prohibitory" injunctions). Specifically, the party seeking a mandatory injunction must "show[] clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Dallas Safari Club*, 453 F. Supp. 3d at 398.

The parties here disagree over whether this heightened standard applies to the Church's proposed injunction. *See* Defs.' Opp. at 26–27 (arguing mandatory-injunction standard applies); Hr'g Tr. 15–18. (Church's counsel disputing "mandatory" characterization). The Court is inclined to agree with the Church that its proposed injunction is not mandatory because it would not command the government to act; indeed, the Church seeks to *enjoin* the District from enforcing its restrictions. But the Court need not decide whether the mandatory-injunction standard applies because a preliminary injunction would be warranted under either standard.

In general, "[a] preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits," although an evidentiary hearing is required where there are "genuine issues of material fact" precluding a decision on the filings. *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004); *cf. Shvartser v. Lekser*, 330 F. Supp. 3d 356, 361 (D.D.C. 2018) (deciding hearing was unnecessary where defendants did not request hearing or raise any "genuine issues of material fact"). That said, because preliminary injunctions are a drastic measure, "any injunction that the court issues must be carefully

circumscribed and tailored to remedy the harm shown" by the facts. *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 284 (D.D.C. 2018) (cleaned up).

### III.

### A.

The Church must first make a clear showing that it is likely to succeed on the merits of one or more of its claims. *League of Women Voters*, 838 F.3d at 6. The Court begins with the Church's claim under RFRA.

A near-unanimous Congress enacted the Religious Freedom Restoration Act of 1993 to bolster protections for religious liberty. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014); 42 U.S.C. § 2000bb (stating findings and purposes). Spurred by *Employment Division Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court narrowly interpreted the First Amendment's Free Exercise Clause, Congress sought to restore the pre-*Smith* legal landscape and further protect those whose religious exercise is "substantially burdened" by the government. 42 U.S.C. § 2000bb(b).[6] This instinct to protect religious freedom has roots that predate the Constitution. *See* James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), *in* SELECTED WRITINGS OF JAMES MADISON 21, 22 (Ralph Ketcham ed., 2006) ("The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate.").

---

[6] Recent cases denying injunctive relief for First Amendment challenges to COVID-19-related restrictions are therefore of limited help to the District. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020).

Inherent—and, indeed, explicit—in Congress's design for RFRA was a desire to allow individuals to seek judicial relief from even neutral laws.  *See* 42 U.S.C. § 2000bb-1.  So Congress fashioned a new statutory framework.  RFRA provides that the government may not "substantially burden" a person's exercise of religion, "even if the burden results from a rule of general applicability."  *Id.* § 2000bb–1(a).  "The only exception recognized by the statute requires the government to satisfy the compelling interest test," that is, "to demonstrate that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (quoting 42 U.S.C. § 2000bb–1(b)) (cleaned up).  The term "demonstrates" means "meet[ing] the burdens of going forward with the evidence and of persuasion."  *Id.* at 428.  As a covered entity under the statute, the District of Columbia and its officials must comply with RFRA.  *See* 42 U.S.C. § 2000bb-2.[7]

### 1.

To benefit from RFRA's protections, the Church must first show a substantial burden on its religious exercise.[8]  Only once that substantial burden has been established will the onus then shift to the government to show that the law or regulation at issue is the least restrictive means to further a compelling interest.  *Id.* § 2000bb–1(b).  RFRA defines "religious exercise" to include

---

[7]  As originally enacted, RFRA applied to states as well as the federal government.  But in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that the statute's application to the states was beyond Congress' legislative authority under the Fourteenth Amendment.  *Id.* at 536.  RFRA continues to bind the District.  *See Potter v. District of Columbia.*, 558 F.3d 542, 546 (D.C. Cir. 2009).

[8]  Although RFRA speaks of a "person's" exercise of religion, the Supreme Court has confirmed that RFRA protections extend to entities such as churches, nonprofit organizations, and closely held corporations.  *See Hobby Lobby*, 573 U.S. at 707–08.

"any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000bb–2(4), 2000cc–5(7).  A litigant's claimed beliefs "must be sincere and the practice[] at issue must be of a religious nature." *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002).  But because the burdened practice need not be strictly compelled by the religious tradition at issue to merit protection, courts "focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).  A "substantial burden" exists when government action rises above *de minimis* inconveniences and puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.*

The Church believes that its congregation must meet in person each Sunday to worship together.  Dunlop Decl. at 1.  The Church traces its commitment in part to "the scriptural exhortation that adherents should 'not forsak[e] the assembling of ourselves together.'"  Pl.'s Mot. at 10 (citing Hebrews 10:25 (KJV)).  In a 2012 book, the Church's Senior Pastor, Dr. Mark Dever, wrote that a "biblically ordered church regularly gathers the whole congregation" because without regularly meeting together, it ceases to be a "biblically ordered church."  Dunlop Decl. Ex. 3 at 6, ECF No. 5-3.  This conviction echoes the Twelve Tribes of Israel gathering together to worship, *see, e.g.*, 2 Kings 23:1–3 (KJV), and St. Paul's admonition that the church is "the body of Christ," 1 Corinthians 12:27 (KJV).

The sincerity of this belief is evident in the Church's pre-COVID-19 practices:  Unlike many other houses of worship, the Church resisted holding multiple worship services on Sundays, even as attendance approached 1,000 congregants.  Dunlop Decl. at 1.  The Church contends that its religious exercise is substantially burdened by the District limiting all worship services to no more than 100 people—no matter if they are outdoors, wearing masks, and

socially distanced—as this has prevented the Church from meeting at all as a congregation since March. *Id.* at 2. Should it choose to contravene the District's restrictions, the Church risks incurring civil and administrative penalties, *see* Mayor's Order 2020-075 at 12, including fines of $1,000 per violation, D.C. Code § 7-2307.

For its part, the District does not dispute the sincerity of the Church's belief that its members must gather together in person for worship. Defs.' Opp. at 46. Rather, it maintains that the Church has nonetheless failed to prove that the District's restrictions have substantially burdened the Church's religious exercise—particularly where there are other "methods" of worship available. *Id.* at 45. The District proposes that under its current restrictions the Church could "hold multiple services, host a drive-in service, or broadcast the service online or over the radio," as other faith communities in the District have done. *Id.* at 46.

But the District misses the point. It ignores the Church's sincerely held (and undisputed) belief about the theological importance of gathering in person as a full congregation. The "substantial burden inquiry asks whether the government has substantially burdened religious exercise . . . not whether [the Church] is able to engage in other forms of religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015). The District may think that its proposed alternatives are sensible substitutes. And for many churches they may be. But "it is not for [the District] to say that [the Church's] religious beliefs" about the need to meet together as one corporal body "are mistaken or insubstantial." *Hobby Lobby*, 573 U.S at 725; *see also On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 911 (W.D. Ky. 2020) (holding that it is "not the role of a court to tell religious believers what is and isn't important to their religion, so long as their belief in the religious importance is sincere"). It is for the Church, not the District or this

Court, to define for itself the meaning of "not forsaking the assembling of ourselves together." Hebrews 10:25.

Nor should the Court weigh the relative burden to the Church by looking to how easily other religious groups with distinct beliefs have voluntarily changed their worship to accommodate the District's restrictions. The "question that RFRA presents" is whether the challenged action "imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*." *Hobby Lobby*, 573 U.S. at 724 (emphasis in original). The District's restrictions surely have: The 100-person limit on worship services has prevented the Church from meeting as a complete congregation, as its faith requires, since March. The restrictions have thus "substantial[ly] pressure[d]" the Church to "modify [its] behavior and to violate [its] beliefs." *Kaemmerling*, 553 F.3d at 678. That the Church may continue to hold services outdoors in Northern Virginia is no consolation; the government cannot defeat a RFRA claim merely by telling citizens to go practice their religion in another jurisdiction. *Cf. W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 849 F. Supp. 77, 78–79 (D.D.C. 1994) (finding RFRA barred city from denying church permit to continue feeding the homeless on church property even though it could obtain permit to operate its charity program elsewhere).

The District cites several cases in which the D.C. Circuit held that government restrictions did not impose a substantial burden under RFRA, but they only underscore the importance of focusing on how government action affects religious exercise. In *Henderson v. Kennedy*, the Court denied a RFRA claim when the plaintiffs challenged a regulation prohibiting them from selling t-shirts on the National Mall. 253 F.3d 12, 16 (D.C. Cir. 2001). The plaintiffs' "declarations d[id] not suggest that their religious beliefs demand that they sell t-shirts

in every place human beings occupy or congregate," nor specifically at the National Mall.  *Id.*
The Court determined that there was no substantial burden on the plaintiffs' high-level, yet
sincere, commitment to preaching their religious message "by all available means," when an
infinite number of means remained unencumbered.  *Id.*  The plaintiffs' sincerely held religious
belief—spreading the message of the Gospel to others—could still be exercised.  Not so for the
Church, whose convictions mandate meeting together in person as a full congregation.  That
belief cannot be legally exercised here so long as the District's restrictions remains in place.

Or take *Mahoney v. Doe*, in which the D.C. Circuit rejected the plaintiff's challenge
under RFRA to an ordinance prohibiting the defacement of the street in front of the White
House.  642 F.3d 1112, 1120–22 (D.C. Cir. 2011).  The court noted that "chalk art" was "only
part of [the plaintiff's] public prayer vigils, demonstrations, protests and rallies," and the
government did not force the plaintiff "to engage in conduct that [his] religion forbids" or
prevent him "from engaging in conduct [his] religion requires."  *Id.* at 1121.  The plaintiff thus
did not establish a belief specific to the activity that the challenged regulations would burden.  In
contrast, the Church faces "civil and administrative penalties" if it physically meets as one
congregation in the city.  Mayor's Order 2020-075 at 12.

The District has not, as it contends, banned merely one "method of worship," but instead
has foreclosed the Church's *only* method to exercise its belief in meeting together as a
congregation, as its faith requires.  Given the District's restrictions, the Church now must choose
between violating the law or violating its religious convictions.  This constitutes a substantial
burden under RFRA.

**2.**

Because the Church has shown that the District's restrictions substantially burden its religious exercise, the onus shifts to the District to prove with admissible evidence that applying its restrictions to the Church "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb–1(b); *O Centro*, 546 U.S. at 430–31.

The Court must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harms of granting specific exemptions" to this Church in particular.  *Id.* at 431.  This standard is "exceptionally demanding."  *Hobby Lobby*, 573 U.S. at 728.  It requires the District to show that "no alternative forms of regulation would accomplish the compelling interest without infringing religious exercise rights."  *Kaemmerling*, 553 F.3d at 684 (cleaned up).  In facing this strict scrutiny, the burden remains on the District, even as the Church moves for a preliminary injunction.  *O Centro*, 546 U.S. at 429 (noting that burdens at preliminary injunction stage track those at trial).

At the outset, the District urges that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), relaxes the heavy burden that would normally fall on it.  *Jacobson* counseled that "under the pressure of great dangers"—a recent smallpox outbreak—constitutional rights may be reasonably restricted "as the safety of the general public may demand."  *Id.* at 29.  Courts have recently invoked *Jacobson* when assessing whether governmental measures in response to the COVID-19 pandemic infringe on individual rights and liberties.  *See*, *e.g.*, *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020).  But there are reasons to think that *Jacobson* is not an appropriate lodestar here.

*First*, *Jacobson* addressed whether a state law mandating vaccination violated an individual's Fourteenth Amendment substantive due process "right to care for his own body and health in such way as to him seems best."  197 U.S. at 26.  The unique array of claims before the *Jacobson* Court—such as that the regulation violated the preamble and spirit of the Constitution—included none under the First Amendment.  It may very well be that it "is a considerable stretch to read [*Jacobson*] as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case."  *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Mem.) (Alito, J., dissenting).[9]

*Second*, woven into *Jacobson* is the recognition that at the time the plaintiff refused the vaccination, smallpox was "prevalent and increasing" in the area and posed an acute risk to public health.  197 U.S. at 28.  And we know the feeling:  Much of this city and country have faced similar public health risks recently or are facing them currently.  In such circumstances, judicial scrutiny may recede to its lowest ebb, leaving room for an energetic response by the political branches to the many uncertainties accompanying the onset of a public health crisis.  But when a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out.  "While the law may take periodic naps during a

---

[9]  To the extent that the District argues that the Supreme Court "rejected" one or more parts of Justice Alito's dissent in *Calvary Chapel*, it is mistaken on the meaning of the Supreme Court's denial of emergency relief.  Such denials are not "decision[s] on the merits of the underlying legal issues."  *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009).  For instance, the Court may deny relief based merely on the lack of a reasonable probability that at least four Justices will consider the issue sufficiently meritorious to later grant certiorari.  So other Justices, and even a majority of the Court, may very well have agreed with Justice Alito's suspicion of *Jacobson* and its application to the issues facing the Court.  The Court's mere denial of relief should not be read as indicative of its views on the merits.

pandemic, we will not let it sleep through one." *Roberts v. Neace*, 958 F.3d 409, 414–15 (6th Cir. 2020) (per curiam).

*Third*, and most importantly, the District articulates no reason why *Jacobson*'s framework applies when assessing a RFRA claim. The District cites no cases in which a court has applied *Jacobson*'s relaxed standard instead of the strict scrutiny test detailed in the statute. *See* 42 U.S.C. § 2000bb–1(b).[10] And recall that RFRA "did more than merely restore the balancing test used in the [pre-*Smith*] line of cases; it provided even broader protection for religious liberty than was available under those decisions." *Hobby Lobby*, 573 U.S. at 695 n.3. Congress incorporated a specific burden-shifting framework into RFRA. Courts must respect that decision and dutifully apply its scheme.

Under RFRA, the District must prove a compelling interest in banning the specific religious practice at issue: Gathering for religious worship outdoors while wearing masks and

---

[10] At the hearing, counsel for the District listed three cases that cite *Jacobson*. But none of these cases *apply* reasoning from *Jacobson* to override the clear burden-shifting scheme detailed in RFRA, as the District urges here. In *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995), the Fourth Circuit listed cases in which the Supreme Court has identified compelling government interests, as well as characterized *Jacobson* as a case where the Court "discuss[ed] fundamental 'liberty' interests" and "found the public health and safety interest decisive in upholding mandatory vaccination." *Id.* at 655–56 and n.7. This is unremarkable. No one denies that public health and safety *may* serve as compelling interests in challenges under the First Amendment or RFRA. The Fourth Circuit did not rely on *Jacobson* for anything more, especially not relieving the government of its compelling interest burden. *Id.* at 656. Counsel next pointed to *Cassell v. Snyders*, No. 20-C-50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020). This case is of little help as it analyzed claims under the First Amendment and Illinois's RFRA, not the federal statute passed by Congress and at issue here. More, although *Cassell* read *Jacobson* as holding that "[d]uring an epidemic . . . the traditional tiers of constitutional scrutiny do not apply," *id.* at *6, this altered the court's analysis of only the Free Exercise claim, *see id.* at *7 (stating that "because the current crisis implicates *Jacobson* . . . Plaintiffs have a less than negligible chance of prevailing on their constitutional claim"). The court later analyzed the Illinois RFRA claim separately, without reference to *Jacobson*. Counsel's third case was *Illinois Republican Party v. Pritzker*, No. 20-C-3489, 2020 WL 3604106 (N.D. Ill. July 2, 2020), a case with no claims under RFRA and no relevance here.

socially distancing.  As the Sixth Circuit recently explained when enjoining similar restrictions

based on Kentucky's RFRA statute:  "The likelihood-of-success inquiry instead turns on whether

[the] orders were 'the least restrictive means' of achieving these public health interests.  Ky. Rev.

Stat. § 446.350.  That's a difficult hill to climb, and it was never meant to be anything less."

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020) (citing *Barr v. City

of Sinton*, 295 S.W.3d 287, 289 (Tex. 2009); *Holt*, 574 U.S. at 364).

The District cannot rely on its generalized interests in protecting public health or

combating the COVID-19 pandemic, critical though they may be.  Rather, RFRA requires the

District to "demonstrate that the compelling interest test is satisfied through application of the

challenged law 'to the person'—the particular claimant whose sincere exercise of religion is

being substantially burdened."  *O Centro*, 546 U.S. at 430–31.  The District has failed to meet its

burden at this stage, as it presented little to no evidence that it has a compelling interest in

applying its restrictions to ban the type of services that the Church wishes to hold.[11]  And some

of the scant evidence that does appear in the record cuts against the District's arguments.

Consider the District's response to mass protests over the past year, which included

thousands of citizens marching through the streets of the city, including along streets that the

District closed specifically for that purpose.  Pl.'s Mot. at 17–20; Defs.' Opp. at 33–34.  And the

Mayor appeared at one of the mass gatherings, "welcom[ing]" hundreds if not thousands of

protestors tightly packed into Black Lives Matter Plaza and announcing that it was "so wonderful

to see everybody peacefully protesting, wearing [their] mask[s]."[12]  Indeed, Mayor Bowser

---

[11]  The District had a chance to seek an evidentiary hearing for this motion, but it declined.  *See*
Hr'g Tr. at 2–4.  It also opposed the Church's request to subpoena the Mayor.  *Id.*

[12]  WUSA9, *DC Mayor Bowser Attends Justice For George Floyd Protest At Black Lives Matter
Plaza*, YouTube.com (June 6, 2020), https://www.youtube.com/watch?v=-
ZVyhydp1lU&feature=youtu.be.  Although the District contends that it has no authority over

christened "Black Lives Matter Plaza" when "she directed the D.C. Department of Public Works to create a mural on 16th Street N.W., near the White House, to 'honor the peaceful protesters from June 1, 2020 and send a message that District streets are a safe space for peaceful protestors.'" *Penkoski v. Bowser*, --- F. Supp.3d ---, 2020 WL 4923620, at *2 (D.D.C. Aug. 21, 2020).

No matter how the protests were organized and planned, the District's (and in particular, Mayor Bowser's) support for at least some mass gatherings undermines its contention that it has a compelling interest in capping the number of attendees at the Church's outdoor services.  The Mayor's apparent encouragement of these protests also implies that the District favors some gatherings (protests) over others (religious services).  When faced with similar facts in a First Amendment challenge, another court explained that high-profile government officials encouraging and participating in protests "sent a clear message that mass protests are deserving of preferential treatment." *Soos v. Cuomo*, --- F. Supp.3d ---, 2020 WL 3488742, at *12 (N.D.N.Y. June 26, 2020).  The court noted that the officials—Governor Cuomo and Mayor de Blasio—could have "been silent" or "could have just as easily discouraged protests, short of condemning their message, in the name of public health." *Id*.  So too here.  Mayor Bowser, like Mayor de Blasio, is a high-level government official with "clear enforcement power." *Id*.  Her actions speak volumes.

The District attempts to distinguish the risks posed by mass "protest marches" from those posed by "worship services in which individuals stand in place for long periods of time," Defs.' Opp. at 33, but it marshaled no scientific evidence on this point.  Its main source of support

protests on federal land, *see* Defs.' Opp. at 23, at least some mass protests—including the one at Black Lives Matter Plaza where Mayor Bowser spoke—have taken place on the District's property.

stems from an assertion made by Christopher Rodriguez, Ph.D.,[13] Director of the District's

Homeland Security and Emergency Management Agency, in a declaration stating:  "Different

events present different levels of threat about the spread of COVID-19; for example, the risk is

higher for an event involving people standing in one place than for one in which people are

moving."  Decl. of Christopher Rodriguez at 2, ECF No. 15-5.  If this assertion is making a

scientific claim, it falls well short of the evidentiary standard in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *Cf. United States v. H & R Block, Inc.*, 831 F.

Supp. 2d 27 (D.D.C. 2011) (applying *Daubert* analysis to evidence presented in opposition to

preliminary injunction).  And even if the Court credited this statement, which it does not, it

would not by itself establish that fully-masked and socially distanced outdoor worship is

particularly dangerous.  In fact, the District's brief explains that the protests did not trigger any

spike in COVID-19 "outbreaks," undermining the notion that large gatherings are always

exceptionally dangerous.  *See* Defs' Opp. at 33; *see also* Hr'g Tr. at 44–45.

Now months into this public health crisis, the District has had the opportunity to

determine with greater particularity the risks presented by COVID-19 and the restrictions

necessary; sweeping justifications perhaps more suitable to the early stages of a public health

crisis will not suffice.  On the record here, the District has not shown that it has a compelling

interest in applying its 100-person limit to the Church's proposed outdoor services.

Even if the District met its burden to show a compelling interest, it would also need to

establish that there are no less restrictive means to further that interest than prohibiting the

Church from gathering more than 100 congregants within the city.  This "least-restrictive-means

---

[13]  As pointed out by the Church at the hearing, Dr. Rodriguez earned his Ph.D in political
science.  Hr'g Tr. at 29–30.  He appears to have no medical background.

standard is exceptionally demanding," as it mandates that if "a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 364–65. The District insists that "[n]arrower ways to promote public safety would be less effective in preventing the spread of the virus," Defs.' Opp. at 39, yet it neglects to demonstrate how it knows this to be the case. RFRA demands more from the District than bare assertions. *See* 42 U.S.C. § 2000bb–2(3) (stating that the "term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion").

This is especially true when the District currently treats some activities with a lighter hand. Seemingly given a pass are outdoor dining establishments, or "streataries." Pl.'s Mot. at 14. The District has permitted hundreds of dining establishments to serve meals outdoors. *See* Martens Decl. Ex. 15 at 5, ECF No. 4-15. More than just providing food for consumption, outdoor restaurants serve as focal points for fellowship and communion, not unlike worship services. Yet outdoor dining establishments currently face no limit on the number of patrons they may serve, as "persons sitting outdoors" are not counted for their capacity limitations. Mayor's Order 2020-075 at 5–6. Perhaps there are good reasons for this distinction, but the District yet again leaves the Court to speculate.

More, an amicus curiae brief submitted by the Becket Fund for Religious Liberty details the regulations in effect in all 50 states, most which either contain no capacity limitations for outdoor gatherings or explicitly exempt religious gatherings from capacity limitations otherwise in effect. *See* Becket Br. Ex. A, ECF No. 25-1. The Court acknowledges the District's contention that *statewide* orders in effect in states around the country may not be appropriate comparators for this city, given its size, location, and population density. Hr'g Tr. at 35–36. But that the Church has been congregating across the river in Northern Virginia, where there are no

capacity limitations on worship services, casts doubt on the need for the District's chosen policy. *See Hobby Lobby*, 573 U.S. 682 at 730–31 (determining less restrictive means available in part by existence of alternative "approach" used in similar circumstances).

For its part, the Church outlines other policies, such as holding services outside with mandatory social distancing and mask-wearing, that it suggests are less restrictive but equally effective in mitigating transmission of the virus.[14]   The District was, of course, welcome to refute the Church's claim with evidence of its own.   But the Church "must be deemed likely to prevail unless the Government has *shown* that [the movant's] proposed less restrictive alternatives are less effective than [enforcing the District's capacity limit]."   *O Centro*, 546 U.S. at 429 (emphasis added).   The District has failed to carry its burden on the record here, and therefore the Church has shown that it is likely to succeed on the merits.[15]

*   *   *

After briefing concluded on the Church's motion for a preliminary injunction and after the Court held a hearing on that motion, the District filed a "Supplemental Declaration."   *See* Notice of Suppl. Decl., ECF No. 40.   This was improper.   At the September 23 conference on this matter, the Court made clear the briefing schedule, pushing the due date of the District's Opposition to October 2 to augment its time to respond.   The District opposed the Church's

---

[14]   Notably, the District has distinguished between outdoor and indoor events for other types of gatherings.   For example, restaurants may serve patrons "up to fifty percent (50%) of their maximum capacity," but "persons sitting outdoors are not counted in this capacity limit."   Mayor's Order 2020-075 at 5–6.

[15]   The Church's complaint argues that the District has also violated the First Amendment's Free Speech, Freedom of Assembly, and Free Exercise Clauses, as well as the Fifth Amendment's Due Process Clause.   Compl. at 17, 19, 22–23.   Because the Church is likely to succeed on the merits of the its RFRA claim, and considering the interest in expeditiously resolving this motion, the Court does not reach the Church's constitutional claims now.

request to further develop the factual record by calling the Mayor as a witness, and it did not

request an evidentiary hearing.  It never sought leave to submit additional evidence.  The Court

will not condone the District sandbagging the Church at the eleventh hour.  The Court will

therefore strike the filing.  *Accord McGovern v. Geo. Wash. Univ.*, 245 F. Supp. 3d 167, 179

(D.D.C. 2017).

Even if the Court were inclined to consider the District's filing, the outcome would not

change.  Along with the declaration of Dr. LaQuandra Nesbitt, who admits that her office "has

not studied the proposals of Capitol Hill Baptist Church," Decl. of Dr. LaQuandra Nesbitt at 4,

ECF No. 40-1, the District submits two exhibits.  Neither addresses the Church's claims.  Both

exhibits summarize health studies that analyze apparent exposures to COVID-19 stemming from

indoor, non-socially distanced, unmasked church gatherings in March 2020.  *See* Defs.' Notice

of Suppl. Decl., Exs. 1, 2, ECF No. 40-1.  The studies do not address activities like those

proposed by the Church.  And the Court rejects any suggestion that religious gatherings in

themselves are somehow especially conducive to COVID-19.  *See Maryville Baptist Church*, 957

F.3d at 615 ("Risks of contagion turn on social interaction in close quarters; the virus does not

care why they are there.").

## B.

The Court next considers whether the Church has shown that it will suffer irreparable

injury in the absence of injunctive relief.  *See League of Women Voters*, 838 F.3d at 6.  When

plaintiffs "establish[] a strong likelihood of success on the merits of their RFRA claim," they

have also "adequately demonstrated that they will suffer irreparable harm absent the issuance of

a preliminary injunction."  *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129

(D.D.C. 2012).  This is because "it is well settled that 'the loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury,'" and "by extension the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)) (cleaned up).  The conclusion that the Church is likely to succeed on the merits of its RFRA claim therefore also suffices to show that the Church will be irreparably harmed without injunctive relief.[16]

Even if irreparable injury did not automatically follow from the likelihood-of-success-on-the-merits factor, the Court would have no trouble concluding that the Church has made a showing adequate to obtain injunctive relief.  To show irreparable injury, a party seeking a preliminary injunction must ordinarily show:  (1) that the harm is "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm'"; and (2) that the harm is "beyond remediation." *League of Women Voters*, 838 F.3d at 7–8 (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

The Church has made the first showing because it has been and continues to be prevented from exercising its religion as it sees fit—under pain of violating the law—so long as the District's current restrictions are in effect.  This is not the sort of harm that has been held "far too speculative to warrant preliminary injunctive relief." *Chaplaincy of Full Gospel Churches*, 454

---

[16]  Some cases suggest, in the First Amendment context at least, that a plaintiff must "do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction frame-work." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).  In particular, a movant must prove that its rights "are either threatened or in fact being impaired at the time relief is sought." *Id.* (quoting *Nat'l Treas. Empls. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991)).  The Church has made that showing here, as its ability to meet as a congregation is "in fact being impaired" by the District's current restrictions.

F.3d at 298 (holding that Navy's "practice of retaining Catholic chaplains past applicable age limits" constituted only "hypothetical" injury for Protestant chaplains). The Church has also made the second showing because, according to the Church's undisputed, sincerely held belief, there is no substitute for meeting as a unified whole. *See, e.g.*, Pl.'s Mot. at 7. Missing a chance to gather on Sunday is not a "[m]ere injur[y] . . . in terms of money, time and energy," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98, but instead a harm for which "there can be no do over and no redress," *League of Women Voters*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see also Maryville Baptist Church*, 957 F.3d at 616 (reasoning that "the prohibition on attending any worship service [on Sundays] assuredly inflicts irreparable harm").

The District argues that the Church does not face irreparable harm because it can either keep meeting in Virginia or conduct services in the District within the limits of the current restrictions—*i.e.*, the Church could "conduct an unlimited number of services . . . with 100 or fewer people at a time," broadcast its services "by radio," or use "drive-in services." Defs.' Opp. at 50. Not so. Recall that meeting physically as a whole congregation is crucial to what the District admits is the Church's sincerely held religious belief. *Id.* at 46. While some of its members have been able to meet in Virginia, the Church could not gather as an entire congregation. Most of the Church's members reside in the District, and many members do not have transportation to attend services outside the District. Dunlop Decl. at 2–3.

The Court likewise rejects the District's argument that the Church cannot show irreparable harm because of its delay in seeking injunctive relief. *See* Defs.' Opp. at 51–52. The District contends that the Church waited "more than six months after the first Mayor's Order restricting mass gatherings" to sue. *Id.* at 52. But as the District admits, the Church was not

twiddling its thumbs during that period—it "discussed with the District alternatives to full-congregation meetings" and "twice sought administrative relief in the form of an exemption from the Mayor's Orders." *Id.* at 52.  This is the sort of behavior that courts ordinarily encourage—indeed, sometimes require, *see, e.g.*, *Park v. Howard Univ.*, 71 F.3d 904, 909 (D.C. Cir. 1995) (barring a plaintiff's hostile-work-environment claim because "she failed to exhaust her administrative remedies for such a claim at the EEOC")—from would-be plaintiffs in the interest of efficiency and judicial economy, *cf. Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C. Cir. 1984) (stating that, among other purposes, the exhaustion requirement "promotes judicial economy . . . by perhaps avoiding the necessity of any judicial involvement at all").  The Church will not now be punished for seeking an amicable resolution before rushing to the courthouse.

## C.

Finally:  Has the Church shown that the balance of the equities and the public interest support the Court granting relief?  These factors merge when, as here, the government is the party opposing the injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (applying *Nken* in the context of a preliminary injunction).

The balance of the equities and the public interest favor the Court granting relief.  While the public clearly has an interest in controlling the spread of disease, *see* Defs.' Opp. at 53–54, the public also has an interest in honoring protections for religious freedom in accordance with the laws passed by Congress, *cf. Tyndale House Publishers, Inc.*, 904 F. Supp. 2d at 130 ("[T]here is undoubtedly also a public interest in ensuring that the rights secured under the First Amendment and, by extension, the RFRA, are protected.").  Here, where the Church is likely to succeed in proving that the District has violated its rights under RFRA, the equities and public interest weigh in its favor.  The Church has consistently represented that it will take appropriate

precautions such as holding services outdoors, providing for social distancing, and requiring masks. Pl.'s Reply Br. at 25.[17]  As explained, the District has not put forward sufficient evidence showing that prohibiting a gathering with these precautions is necessary to protect the public.

## IV.

The COVID-19 pandemic has undoubtedly presented unique challenges to governments, which are tasked with balancing the public safety and religious freedom.  The Court acknowledges the difficult decisions facing the Mayor here.  But Congress set rules for this sort of balancing when it enacted RFRA.

The Church has shown that it is likely to succeed in proving that the District's actions impose a substantial burden on its exercise of religion.  For its part, the District has not shown that it is likely to prove a compelling interest in prohibiting the Church from holding outdoor worship services with appropriate precautions, or that its restrictions are the least restrictive means available to achieve its public health objectives.

The Court grants the Church's motion for injunctive relief.  A separate order will issue.


Dated:  October 9, 2020                          _____
                                                                    TREVOR N. McFADDEN, U.S.D.J.

---

[17]  Though the District argues that "hundreds of houses of worship around the District" would be permitted "to hold gatherings in excess of 100 persons" were the Court to grant relief, Defs.' Opp. at 53, the Church clarified at oral argument here that it is not pursuing a class action and seeks relief only specific to its services, Hr'g Tr. at 18–19; *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs").